### *TABLE OF CONTENTS*

**Page**

**OVERVIEW**     **1**

**INTRODUCTION**     **1**

**FACTUAL BACKGROUND**     **3**

**ARGUMENT**     **9**

**I.   Standard For Motion To Dismiss**     **9**

**II.   The Declaratory Judgment Count Is Not Even Challenged On Its Merits**     **10**

**III.   Rotwein's Laches And Limitations Arguments Are Without Merit**     **11**

**IV.   Rotwein's Attempt to Repudiate Her Fiduciary Duties Is Unavailing**     **22**

**V.   Bell's Count For Breach Of Contract States A Claim**     **31**

**VI.   Bell Sufficiently Pleads Actual Fraud By Rotwein, And Any Missing Information Is Under The Exclusive Control Of Rotwein**     **32**

**VII.   Bell Sufficiently Pleads Negligent Misrepresentation By Rotwein**     **35**

**VIII.   Albert Bell's And Bell's Reliance On Joseph Rotwein's And Rotwein's Performance Of Their Duties Over 50 Years Supports Equitable Estoppel**     **38**

**IX.   Bell Has Alleged Causes Of Action For Spoliation And Conversion Based On The Disappearance Of The Original Document Entrusted To Joseph Rotwein And Received By Rotwein After His Death**     **42**

**CONCLUSION**     **45**

**TABLE OF AUTHORITIES**

**FEDERAL CASES**                                                                **PAGE**

*Atchinson v. District of Columbia,*
    73 F.3D 418 (D.C. Cir. 1996) ...............................................................9, 10

*Air Line Pilots Ass'n, Intern v. O'Neill,*
    499 U.S. 65, 111 S.Ct. 1127 (1991)...........................................................24

*American Century Mortgage Investors v. Unionamerica Mortgage
    and Equity Trust,* 355 A.2d 563 (D.C. 1976)..............................................38

*Avianca, Inc. v. Corriea*, 1991 WL 496132 (D.D.C. May 31, 1991) .....................................34

*Behrens v. Pelletier,*
    516 U.S. 299, 116 S.Ct. 834 (1996)...........................................................9

*Bell Atlantic Corp v. Twombly,*
    127 S.Ct. 1955 (2007)...............................................................................9

*Bolger v. District of Columbia,*
    510 F.Supp.2d 86 (2007) ........................................................................10

*Burlington Ins. Co. v. Okie Dokie, Inc*., 329 F.Supp.2d 45 (D.D.C. 2004) ............................36

*Burka v. Aetna Life Ins. Co.,*
    56 F.3d 1509 (D.C. Cir. 1995) ................................................................15

*Braude & Margulies, P.C. v. Fireman's Fund Ins. Co.,*
    468 F.Supp.2d 190 (D.D.C. 2007) ..........................................................18

*Cabaniss v. Cabaniss,*
    464 A.2d 87 (D.C. Ct. App. 1983)............................................................23

*Cassidy v. Owen*, 533 A.2d 253 (D.C. 1987) ........................................................................38

*Conley v. Gibson,*
    355 U.D. 41, 78 S.Ct. 99 (1957) ...............................................................9

*Day v. Sidley and Austin,*
    394 F.Supp. 986 (D.D.C. 1975).........................................................25, 29

*De Valengin's Adm'rs v. Duffy,*
    39 U.S. 282, 10 L.Ed. 457 (1840).............................................................26

*Dorsey v. American Express Co.,*
    499 F.Supp. 2d 1 (D.D.C. 2007) ................................................................9

*Edwards v. Woods*, 385 A.2d 780 (D.C. 1978).......................................................30

*Egan v. McNamara,* 467 A.2d 733 (D.C. Ct. App. 1983) ......................................23

*Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.,*
    28 F.3d 1268 (D.C. Cir. 1994) ................................................................10

*Fielding v. BT Alex Brown,*
    116 F.Supp.2d 59 (D.D.C. 2000) ...........................................................23

*Franconia Associates v. United States*
    536 U.S. 129 (2002)................................................................15, 16, 19

*Godette v.  Estate of Cox,*
    592 A.2d 1028 (D.C. Ct. App. 1991)..................................................22, 27

*Goldberg, Marchesano, Kohlman, Inc. v. Old Republic Sur. Co.,*
    727 A.2d 858 (D.C. 1999) ......................................................................38

*Gull Airborne Instruments, Inc. v. Weinberger,*
    694 F.2d 838, 224 U.S. App.D.C. 272 (D.C. Cir. 1982) ................11, 13, 15

*Graham v. Taylor Capital Group, Inc. (In re Reliance Sec. Litig.),*
    91 F.Supp.2d 706 (D. Del. 2000)...........................................................24

*Harris Trust and Savings Bank v. Salomon Smith Barney, Inc.,*
    530 U.S. 238, 120 S. Ct. 2180 (2000).....................................................30

*Hertz v. Klavan*,
    374 A.2d 871, 873 (D.C. 1977) ..............................................................30

*In re Crossroad Health Ministry, Inc.*, 319 B.R. 778 (Bkrptcy. D.D.C. 2005) .......30

*In re Estate of Green,*
    912 A.2d 1198 (D.C. Ct. App. 2006)...............................................22, 23, 27

*In re Estate of King,*
    769 A.2d 771 (D.C. Ct. App. 2000)..................................................22, 27

*In re Greater Southeast Community Hosp. Corp.*, 353 B.R. 324 (Bkrtcy. D.D.C. 2006) .......29

*In re Wolensky's Ltd. Partnership,*
　　163 B.R. 615 (Bkrtcy. D. Dist. Col. 1993) ................................................25

*Jeanblanc v. Oliver Carr Co.,*
　　1995 U.S.App.LEXIS 19995 (D.C. Cir. June 21, 1995).............................14

*Kowal v. MCI Communications Corp.,*
　　16 F.3d 1271 (D.C. Cir. 1994) ...................................................................9

*Libby v. LJ Corp.,*
　　247 F.2d 78 (D.C. Cir. 1957) ...................................................................24

*Moore v. Crawford,*
　　130 U.S. 122, 9 S.Ct. 447 (1889) ............................................................30

*Morris v. Buvermo Properties, Inc.,* 510 F.Supp.2d 112 (D.D.C. 2007)................................32

*NAACP v. NAACP Legal Defense & Educ. Fund, Inc.,*
　　735 F.2d 131 (D.C. Cir. 1985) ............................................................ 11-12

*Parker v. Sager,* 85 U.S.App.D.C. 4, 174 F.2d 657 (1949) ) ..................................38

*Pro-Football, Inc. v. Harjo,* 415 F.3d 44 (D.C. Cir. 2005) ...................................11

*Shields v. Washington Bancorporation,* 1992 WL 88004 (D.D.C. Apr. 7, 1992)..................35

*Smith v. Metropolitan Life Ins. Co.,*
　　320 F.2d 778 (D.C. Cir. 1963)..................................................................26

*Southland Manufacturing Corp. v. N.L.R.B.,*
　　475 F.2d 414 (D.C. Cir. 1973) ..................................................................11

*TMG II v. U.S.,*
　　778 F.Supp. 37 (D.D.C. 1991) ..............................................22, 24, 29, 30

*TMG II v. U.S.,* 1 F.3d 36 (D.C. Cir. 1993) ........................................................30

*United States ex rel. Joseph v. Cannon,* 642 F.2d 1373 (D.C.Cir.1981) ................................33

*United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.,*
　　389 F.3d 1251 (D.C. Cir. 2004) .........................................................33, 35

*Vanover v. Hantman,*
　　77 F.Supp.2d 91 (D.D.C. 1999) ...............................................................10

*Weil v. Markowitz,*
    829 F.2d 166 (D.C.Cir. 1987) ..................................................................25

**STATE CASES**

*Holliman v. J.Q. Demoville*, 243 Miss. 542, 547 (1962) .........................................26

*Labovitz v. Dolan,*
    189 Ill. App. 3d 403, 408-09, 412-13, 545 N.E.2d 304, 308, 310 (1989) ..................25

**STATUTES**

D.C. Code Ann. §12-301 ..................................................................16

D.C. Code Ann. § 19-1308.02(a)..................................................................26

D.C. Code Ann. § 19-1310.01(b)(2) ..................................................................26

D.C. Code Ann. § 19-1310.01(b)(3) ..................................................................26

D.C. Code Ann. § 19-1310.01(b)(4) ..................................................................26

D.C. Code Ann. § 19-1310.01(b)(9) ..................................................................26

D.C. Code Ann. § 20-104 ..................................................................21

D.C. Code Ann. § 20-523 ..................................................................22, 27

D.C. Code Ann. § 20-741(3)..................................................................31

D.C. Code Ann. § 20-1301(c)..................................................................16

D.C. Code Ann. § 20-1303(a)..................................................................16, 21

Fed R. Civ. P. 9(b) ..................................................................32, 33, 34, 35

Fed. R. Civ. P. 12(b)(6)..................................................................9, 37

**OTHER AUTHORITIES**

1 Rowley on Partnership § 20.2, at 512-13 (2d ed. 1960) ..................................................................25

28 AM.JUR.2d Estoppel and Waiver §41 (1966) ..................................................................38

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ARTHUR BELL, as Trustee of the** | ) | |
| **Albert R. Bell Living Trust** | ) | **Case No. 1:07-CV-10578** |
| **Plaintiff,** | ) | **Judge: Huvelle, Ellen S.** |
| **v.** | ) | **Deck Type:  General Civil** |
| | ) | |
| **FRANCES ROTWEIN, and Bank of America** | ) | **JURY TRIAL DEMANDED** |
| **Defendants** | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION**
**TO DEFENDANT ROTWEIN'S MOTION TO DISMISS**

Plaintiff, Arthur Bell, as Trustee of the Albert R. Bell Living Trust (hereafter "Bell")
hereby responds to the arguments presented by Defendant Frances Rotwein ("Defendant
Rotwein" or "Rotwein") in support of her Motion to Dismiss Bell's Complaint in this case.

**OVERVIEW**

This case involves a defendant who, with her late husband, has for 51 years held as
nominees and accounted to plaintiff and his father for an interest in an apartment building for
which plaintiff's father paid in full in 1956.   Now that the investment is worth many times the
initial price paid 51 years ago, the defendant seeks to deprive plaintiff of his share, worth
approximately $3 million, of the proceeds of the anticipated sale of the building.

**INTRODUCTION**

This action by Bell was prompted by recent statements made by Defendant Rotwein's
attorneys, suggesting that she intends not to honor Bell's right to 10% of all proceeds (whether
representing income or capital) generated by a one third interest in the apartment building
located at 1500 Massachusetts Avenue, Washington, D.C. ("1500 Building").  That 10% of one-
third is owned by Bell but held in the name of Defendant Rotwein.   The Bell 10% interest in the

Rotwein one-third came into existence in 1956, at the same time as the Rotwein one third interest.   At that time, Albert Bell (settlor of the Trust and therefore Bell's predecessor in interest) paid Joseph Rotwein (Defendant Rotwein's late husband and predecessor in interest) $20,000 in exchange for 10% of the one-third interest Joseph Rotwein was then purchasing. Thereafter, for more than 50 years, as the interest was expanded to include the fee ownership of the building and an adjacent lot, all financed by the owners, including Albert Bell, Joseph Rotwein (the original owner of the one third interest) and his widow, Defendant Rotwein, have honored the Albert Bell 10% interest by paying to Albert Bell or to Bell as his successor in interest, 10% of all income and 10% of all capital distributions.

Record title has always been held in the name of the Rotweins – first Joseph and then Defendant Rotwein.  The reason for that arrangement was for the convenience and benefit of the enterprise, with Joseph promising Albert Bell that he would insure that all proceeds of Bell's 10% of one third were paid, regardless of nominal title.   Initially, Joseph Rotwein gave Albert Bell a copy of the executed assignment and delivered the original to Albert Bell's twin brother, Martin Bell, to hold.   The only purposes of this *de facto* escrow arrangement were (a) to assure Albert Bell that the assignment was complete and effective, and (b) to assure Joseph Rotwein and the other persons managing the syndicate that operated the 1500 Building that the assignment would not be recorded until and unless the managers of the syndicate thought appropriate.   The business reason for delaying the recording of assignments was to prevent the assignees (of whom there were several, both from Joseph Rotwein and from Martin Bell, himself another of the one-third record titleholders) from being able to give strangers a record interest in the building, which might complicate management of the syndicate.

When Martin Bell died, Joseph Rotwein got possession of the original assignment once

again, but again promised Albert Bell that he would keep that document in what amounted to a

continued escrow for the benefit of Albert Bell.    In turn, when Joseph Rotwein died, Defendant

Rotwein succeeded him and continued to pay the 10% to Albert Bell, and then to Bell.

In 2007, 51 years after the arrangement was put into place, Defendant Rotwein's lawyer

suggested to both Bell and another investor that Defendant Rotewein did not believe that Bell or

the other investor would be entitled to share in the proceeds of the liquidation of the 1500

Building without holding *record* title to the property.   Since this position threatens to defraud

Bell and the other investor out of the proceeds of their investments, an amount conservatively

estimated at approximately $3 million for each, Bell has filed this action to protect his rights to

the one tenth of one third interest that has been owned by Bell and his predecessor in interest for

over 51 years.  Confirming the threats made in 2006, Defendant Rotwein has now filed a Motion

to Dismiss the Complaint, the effect of which would be to deprive Bell of any remedy and to

permit Defendant Rotwein to steal from Bell $3 million worth of trust assets.  This is Bell's

response to that motion.

## **FACTUAL BACKGROUND**

Although the foregoing Introduction gives the general thrust of this action, a more

specific knowledge of certain facts is necessary in order to see through the tissue of self serving

opportunism that underlies the position now taken by Defendant Rotwein.

First, Defendant Rotwein misrepresents the thrust of the Complaint in this action, and

blatantly confuses ownership, the equitable right to ownership, and legal title.  Although

expressed in various legal theories, the gist of the case[1] is that 51 years ago Albert Bell, the

---

[1] The one exception to this is the fiduciary waste theory which alleges that Defendant
Rotwein is not only attempting to steal the interests owned by, or to which the Trust is entitled,
but is also allowing the building itself to fall into a state of disrepair, thereby damaging Bell by
reducing the Trust's past and future income and capital value.

settlor of the Trust of which Bell is now trustee, paid Joseph Rotwein $20,000.   In exchange,
Joseph Rotwein assigned to Albert Bell 10% of the one third interest in the 1500 Building that he
was then buying, and also promised to account to Albert Bell for 10% of all distributions of
income and capital received by virtue of his one-third interest.

Also in 1956, another individual, Robert Mayer, invested another $20,000 with Joseph
Rotwein in exchange for another 10% interest in the Rotwein one-third.    Mayer's successor,
Sleepy Hollow Investment Trust, has filed litigation in Superior Court[2] which parallels this
action.   What Bell and Sleepy Hollow are seeking is simply the value of their investments.  It
does not matter whether they each ultimately receive (along with their out of pocket losses) the
cash value of their 10% interests, or a deed for their 10%, or a partnership certificate, or shares in
a corporation, or a certificate for shares in the Syndicate which has been operating the building
for 50 years, or any other form of compensation.  All they want is the value of their investments.

Therefore, Defendant Rotwein is wrong when she claims that Bell's case is "based on a
contention that Albert R. Bell holds a fee simple interest as a tenant in common in certain real
property."  If "fee simple interest" is construed to reflect only "record title" then that may be the
only thing which Bell is *not* contending.  There is no dispute that, for what was represented to be
valid business reasons, the assignment to Albert Bell was never recorded and record title remains
in the hands of Joseph's successor.   But she holds that title in trust for Bell, as successor of
Albert Bell, who bought and paid for it.   What Bell is seeking, once again, is to avoid allowing
his Trust to be cheated out of that investment, which is now worth approximately $3 million.

Numerous legal theories fit the facts as they are known.  These include a resultant trust
because Albert Bell paid for the interest but the Rotweins withheld the original documentation of

---

[2] The Sleepy Hollow case is *Sleepy Hollow Investment Trust LLC v. Defendant Rotwein*,
No. 0006874-07 in the Superior Court for the District of Columbia.

it; a constructive trust because Defendant Rotwein now holds the interest for which Albert Bell paid and should be required to disgorge it; declaratory judgment that whatever the state of record title might be, Bell is entitled to the present value of the income and principal of the investment made by Albert Bell; contract damages, because the deal reduced to its bare essence was that Albert Bell, in exchange for his $20,000, was promised 10% of all income and principal generated by Rotwein's one-third and Defendant Rotwein now threatens not to remit to him his share of the liquidation proceeds; damages for breach of fiduciary duty because both Joseph Rotwein and Defendant Rotwein owed and still owe a fiduciary duty to Albert Bell and then to Bell as his successor (and Defendant Rotwein has now breached that duty by threatening to refuse payment of the proceeds of liquidation.)   Other theories include estoppel, fraud, negligent misrepresentation, spoliation, and conversion.   But whatever the theory, first and foremost, Bell seeks to preserve his rights as Trustee of the Albert Bell Trust to the present value of the investment made by his father 51 years ago, which Defendant Rotwein now threatens to steal.

One thing that makes this case somewhat bizarre is that, from the moment the 10% interest was purchased in 1956, Joseph Rotwein and Defendant Rotwein have scrupulously accounted to Bell and his predecessor for all of the income and capital of this investment.[3]  These distributions of principal and interest have included income derived from interest earned on bank deposits, profits (and losses) generated by the operations of the 1500 Building, profits generated by leasing of an adjacent lot which was purchased with an additional investment made by each of the owners (including $2,500 each from Bell and Mayer), and returns of capital generated by refinancing of the building – all of which were, when tendered to Bell or his predecessor identified as being proceeds of the 10% interest owned by Bell in the Rotwein one-third.

---

[3] This statement is made, of course, subject to obtaining a full review of the books and records of the 1500 Massachusetts Avenue Building to verify that, in fact, distributions made to Bell and his predecessor have been correct.

The document evidencing this investment was an executed Assignment of Interest from Joseph Rotwein to Albert Bell, a copy of which was delivered to Albert Bell and is now in the possession of Bell.   The original of that assignment document was, along with the original Mayer Assignment, placed in a *de facto* escrow with Martin Bell, twin brother of Albert Bell and owner of a different one third interest in the 1500 Building.   The purpose of the escrow arrangement was to assure both investors that their investments were being recognized while assuring Joseph Rotwein that the Assignment documents would not be recorded, which might have permitted the assignees or their heirs to sell and deliver recordable title, thereby introducing strangers to the record title and affecting such matters as financing.

Bell and his predecessor had no particular concern with the form in which the investment was recognized, so long as they were not cheated out of its value.   Indeed, perhaps the most logical theory (but by no means the only one) on which to describe the investment relationship would be as a partnership in which three individual partners, Rotwein, Mayer and Albert Bell, paid in money, which was used to purchase a partnership asset, to wit, one third of the 1500 Building.[4]   As part of that partnership, Albert Bell, and then Bell shared in the profits and losses, but the management of the partnership was entrusted to Joseph Rotwein and then to Defendant Rotwein.   Whether in the form of a partnership or trust or something else, Joseph Rotwein, until his death in 1991, continued to operate it on behalf of himself, Mayer and Bell and to participate in the management of the Syndicate that was operating the 1500 Building on behalf of everyone.

After her husband died, Defendant Rotwein was appointed one of the two personal representatives of his estate, (the other being the predecessor of Bank of America), and

---

[4] This would be a separate partnership entity from the "Syndicate" as which the building as a whole has been operated.  Thus, the partnership among Bell, Rotwein and Mayer owned a one third interest in the building as shown by record title or, in the alternative, it owned a one third interest in the Syndicate and held the real estate interests in trust for the Syndicate.

proceeded to administer the assets of her husband's estate.  One of those assets was his interest in the 1500 Building.  That interest, on the real estate records of the District of Columbia, was a one third undivided interest.  However, Defendant Rotwein knew that her husband really owned only 26.67%, the remaining 6.67% being divided equally between Albert Bell and Robert Mayer. Therefore, after opening an ancillary estate in the District of Columbia, Defendant Rotwein (along with the co-personal representative Bank of America) obtained the appropriate court orders to transfer her husband's interest to the personal representatives.   At that point, she and Bank of America proceeded to disburse the proceeds of the estate and therefore transferred to Defendant Rotwein – first as an individual and then to her Testamentary Trust – a 26.67% interest in the 1500 Building.   She did nothing to disburse the remaining 6.67%.   Indeed, that 6.67% was never part of the estate, even though she took record title as co-personal representative.   A personal representative can take possession of property the deceased held in trust, but only to discharge the same duties as were owed by the deceased.

Throughout this 51 year period, current distributions of capital and income continued to be made in respect of the investments of Mayer and Bell, though in approximately 2001 or 2002, the method changed slightly.   At that point, whereas Joseph Rotwein had received the full one third of any distribution and then sent 10% of it to each of Mayer and Bell, Defendant Rotwein arranged for the management company that had charge of day to day operations on behalf of the Syndicate, to distribute 10% of the income and principal in respect of her record title one-third directly to each of Bell and Mayer.   Her administrative burden was thereby lessened.   From then onward, Defendant Rotwein received directly 26.67% of any Syndicate distributions (80% of one third) and 3.33% was distributed to Bell or his predecessor and the remaining 3.33% was distributed to Sleepy Hollow or its predecessor.    This procedure is still in place.

Moreover on each occasion when the owner of the respective 10% investments changed (such as establishment of the Albert Bell Trust) the checks for distributions were, upon request, directed to the new owners of the investment. Throughout this period absolutely nothing was done which even hinted that there would be an effort to steal the investment from either Bell or Mayer or to challenge their right to exactly what had been provided for 51 years – 10% of every income and capital distribution in respect of the Rotwein one-third.

In her brief, Defendant Rotwein places a great deal of emphasis on an occasion in 1987, shortly after the death of Martin Bell, in which his secretary asked Joseph Rotwein what to do with the two original Assignment documents which had been held by Martin Bell as escrowee. Joseph told her to give them to him. Albert Bell then requested his original document, but Joseph Rotwein reminded him that the purpose of holding the original document in escrow was to further the business of the Syndicate by preventing fractionalization of record title. Joseph also promised Albert that he would continue to see to it that Albert's investment was honored, and even offered to let him record the assignment if Albert Bell would sign a Management Agreement (the text of which is attached to the Complaint), which expressly provided for the distribution to the signatory of his or her pro rata share of the proceeds of any liquidation. The offering of the management agreement further confirms that the original deal was never intended to give Rotwein the liquidation proceeds of the 10% he was selling.

Albert Bell relied on and trusted Joseph Rotwein and did not elect to sign such a Management Agreement, feeling very confident that his reliance was justified and that his old friend Joseph Rotwein would not cheat him. Far from being a defense, this incident is an illustration of the influence wielded by Joseph Rotwein and the reassurances given by Joseph Rotwein that reasonably induced Albert Bell and Bell as his successor (and similarly the Mayers)

8

not to rock the boat of a successful investment that was producing significant income.

**ARGUMENT**

**I.     Standard For Motion To Dismiss**

The Federal Rules of Civil Procedure require only that a complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds on which it rests. *Dorsey v. American Express Co.*, 499 F.Supp. 2d 1, 2 (D.D.C. 2007), *citing Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964 (2007).

In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court must construe the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations. *Dorsey,* 499 F.Supp. 2d at 2, quoting *Kowal v. MCI Communications Corp.*, 16 F.3d at 1276 (The complaint must be "construed liberally in the plaintiffs' favor, and [the Court should] grant Plaintiffs' the benefit of all inferences that can be derived from the facts alleged."). The complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Atchinson v. District of Columbia*, 73 F.3d 418, 422 (D.C. Cir. 1996), citing *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02 (1957).

The court is limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record. *Id.* Furthermore, factual allegations in briefs or memoranda of law may not be considered when deciding a Rule 12(b)(6) motion, particularly when the facts they contain contradict those alleged in the complaint. *Id., citing Behrens v. Pelletier*, 516 U.S. 299,

9

309, 116 S.Ct. 834, 840 (1996) (when a motion to dismiss is based on the complaint, the facts alleged in the complaint control). If any set of facts that could be proved under the complaint would entitle the plaintiff to relief, the complaint must be upheld. *Atchinson*, supra.

## II.    The Declaratory Judgment Count Is Not Even Challenged On Its Merits

Other than lumping it into her laches argument, Rotwein does not even contest plaintiff's right to seek a declaratory judgment. This is not surprising, because the right to a declaratory judgment is self-evident on these facts. A party pursuing a declaratory judgment must allege a likelihood of future violation of his or her rights by the defendant. *See Bolger v. District of Columbia*, 510 F.Supp.2d 86, 92 (2007), *citing Fair Employment Council of Greater Washington, Inc., v. BMC Marketing Corp.*, 28 F.3d 1268, 1273 (D.C. Cir. 1994). A declaratory judgment is appropriate to declare the rights between the parties where there a legal dispute that points to 'a very significant possibility of future harm.' *Id. at 93*, *citing Vanover v. Hantman*, 77 F.Supp.2d 91, 100 (D.D.C. 1999).

Bell alleges such a legal dispute and possibility of future harm. In November, 2006 Plaintiff learned that some of the Record Owners were considering selling the 1500 Building and had asked an attorney whether they could get away with refusing to account to the Bell and Rotwein Assignees for any of the sale proceeds. Compl. ¶ 96. In February 2007, he had his attorneys inquire, and Defendant Rotwein, through her attorney Von Salzen, challenged the basis for Bell's interest in the Rotwein one-third, demanding evidence of record title, and further stated that neither she nor the Bank of America ever had Bell's original assignment document. Compl. ¶¶ 98, 190. This both established the legal dispute – whether an investor can be required to have record title to something he paid for in the expectation that legal title would be held by another on his behalf – and the spectre of future harm. The future harm here is great. Defendant

Rotwein has stated outright that she would not recognize Bell's interest in the liquidation proceeds of the 1500 Building.  Therefore, whether the Record Owners sell the Building (which is being actively pursued), or whether Defendant Rotwein just decides one day that she no longer wants to send the Bell his share of Building and/or Syndicate distributions, Bell will lose out on the value, approximately $3 million, of the investment his father made many years ago.

Therefore, Bell's action for declaratory judgment has been conceded to state a claim and, once the laches argument is disposed of, those counts must stand.   Under them, this Court should declare in favor of Bell's right to 10% of the liquidation proceeds of the Rotwein one-third interest in the 1500 Building.

## III.    Rotwein's *Laches* And Limitations Arguments Are Without Merit

### A.    *Laches* Requires Unexplained Delay And Will Not Run Where The Defendant Has Misled The Plaintiff Into Believing All Was Well

Defendant Rotwein argues that *laches* applies as a bar to her liability on all equitable counts.  That argument is without merit. The bar of *laches* is determined not merely by lapse of time, but by facts indicating prejudice to the defendant, which has arisen by reason of the unreasonable delay of the plaintiff in asserting his demand.  *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 843, 224 U.S. App. D.C. 272 (D.C. Cir. 1982).  The fundamental requisite necessary for application of the doctrine of laches is an *undue and unexplained* delay working injustice to the other party.  *See, e.g., Southland Manufacturing Corp. v. N.L.R.B.*, 475 F.2d 414, 416 (D.C. Cir. 1973) (laches did not bar plaintiffs' suit where delay in action was explained).  Defendants' own case law recognizes this.[5]

---

[5] Even defendant's own case law recognizes that *laches* should only bar a claim where it is unexplained.  *See, e.g., Pro-Football, Inc. v. Harjo*, 415 F.3d 44, 49 (D.C. Cir. 2005) (*laches* turns on whether the party seeking relief delayed inexcusably or unreasonably in filing suit); *see also NAACP v. NAACP Legal Defense & Educ. Fund, Inc*., 735 F.2d 131, 137 (D.C. Cir. 1985) (courts also look for factors that may negate the invocation of *laches* by excusing the delay,

Here, there was no unexplained delay. The Complaint sets forth, in a clear chronology, why plaintiff did not act until now.  There was not even an issue to pursue until November, 2006, when plaintiff learned from a family member that some of the Record Owners were considering selling the 1500 Building and had asked an attorney whether they could get away with refusing to account to the Bell and Rotwein Assignees for any of the sale proceeds. Compl. ¶ 96. He inquired through counsel and the threat was confirmed in February 2007. That was the first notice plaintiff received that Defendant Rotwein might intend to deprive plaintiff of his rightful share of Syndicate proceeds. Before that, Defendant Rotwein led plaintiff to believe that she recognized plaintiff's ownership interest by continuously paying plaintiff his correct proportion of the Syndicate proceeds. Compl. ¶¶ 92-95, Compl. Exs. T, U. Therefore, until he followed up on the November 2006 information and received in response a challenge from Rotwein's lawyer (compl., Ex. W), plaintiff had no reason to take any different or additional steps to protect his ownership interest. Simply put, Defendant Rotwein had until then led plaintiff to believe that his interest was already protected.

Plaintiff reacted almost immediately upon learning of the Record Owners' plans to deprive the Bell and Rotwein Assignees of their investments, by causing an attorney to send a letter just a few months later to the 1500 Building's management and to the then-known Record Owners. Compl. ¶ 97. That letter asserted plaintiff's right to an unrecorded one thirtieth ownership in the 1500 Building. Compl. ¶ 97.   A letter sent a few months after Bell learned of Defendant Rotwein's dishonest intentions, and a suit filed 7 months after his interest was challenged, is hardly a delayed reaction.

The occasion causing this suit is not the 1987 letter Defendant Rotwein attaches to her Motion to Dismiss as Exhibit A. After that letter was received, Albert Bell was given every

including conscious fraud or bad faith by the defendant).

indication that he would continue to receive his full due of Syndicate proceeds and that the business purpose of holding the original document in escrow was unchanged.   As a result, the Bells were unaware of any impending harm until November 2006. Indeed, but for a family member associated with the Martin Bell share, Bell would still not know about Defendant Rotwein's plans to deprive him of his share of the 1500 Building's sale proceeds. Compl. ¶ 96. In a twist of irony, Defendant Rotwein now claims that Bell has not been "vigilant" in defending his right to 10% of one-third of Syndicate proceeds, yet she was one of the parties attempting to secretly deprive plaintiff of such proceeds. That is what is inequitable, and Defendant Rotwein should not be permitted to claim *laches* where she, herself, has caused any "delay" in Bell's ability to be on notice that he needed to take further steps to secure his rightful ownership.

Here, any delay was not unjustified or unexplained – it was caused by Rotwein herself, who repeatedly represented to Bell by her conduct in paying out 10% of distributions that all was well.   Only in early 2007 did she demand, through her attorney, that Bell prove record title to the 10% interest claimed by the Trust.  Compl. ¶ 98.

Furthermore, there has been no prejudice to Defendant Rotwein. Two kinds of prejudice support a *laches* defense.   First, the defendant may have changed his position in a manner that would not have occurred but for plaintiff's delay.  Second, a plaintiff's unexplained and unjustified delay in filing suit may result in a loss of evidence, or unavailability of witnesses supporting defendant's position. *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 844, 224 U.S. App. D.C. 272 (D.C. Cir. 1982).  Neither is applicable here.

First, Defendant Rotwein does not claim that she has changed her position as a result of any sort of delay.  Second, while Defendant Rotwein does claim that because Joseph Rotwein is no longer available, she has been prejudiced, that is simply not the case.  Her version of Joseph

Rotwein's potential testimony on the matter is captured in the letter attached as Exhibit A to Defendant Rotwein's motion to dismiss. Defendant Rotwein herself claims that this letter is a summary of the nature of the transaction from Joseph Rotwein's viewpoint. She has not alleged that he would have testified any differently. Therefore, Defendant Rotwein has not stated any viable prejudice she has suffered.

Joseph Rotwein would not even be competent to testify to the issue at the heart of this case, which is Defendant Rotwein's and the Record Owners' *present* intent to deprive the Bell and Rotwein Assignees of their fair share of Syndicate liquidation proceeds. To Bell's knowledge, Joseph Rotwein was not alive during and was not a participant in that plan, and Defendant Rotwein does not assert otherwise. While alive, Joseph Rotwein accounted to Albert Bell for Syndicate proceeds regularly, including large amounts of capital distributions, and did so until the time of his death. Compl. ¶ 22. There was never any indication that Joseph Rotwein had any intention of depriving Albert Bell of his share of proceeds. Not having Joseph Rotwein available as a witness to testify to activity he was not a party to is not prejudicial to Defendant.

In addition, Defendant Rotwein could not have been prejudiced because she was fully aware of Bell's claim all along. Even her own case law states that *where a potential defendant has knowledge of pending claims*, destruction of evidence will clearly not support a finding of prejudice. *See Jeanblanc v. Oliver Carr Co.*, 1995 U.S.App.LEXIS 19995, at *11-12 (D.C.Cir. June 21, 1995) (emphasis added). If anything, the prejudice goes the other way. The "loss" of the original assignment (only revealed in February 2007) was suffered while it was in the custody of Defendant Rotwein. Compl. ¶¶ 158-59. If the document were still available, Bell would be able to more easily prove his ownership interest against Defendant Rotwein. The loss of evidence over the years has prejudiced Bell, if anyone, not Francis Rotwein.

This is not a case where plaintiff stopped receiving Syndicate proceeds for a number of years and did nothing about it. See *Naselli,* 89 F.Supp. at 945 (applying *laches* where defendant refused to make an accounting to plaintiff for her shares of stock, but plaintiff did nothing about it for seven years). This is a case where any intention to deprive plaintiff of his rightful income was either recently formed or deliberately hidden. No cause of action for declaratory judgment or anticipatory breach accrued until November 2006, when Bell found out about the intentions of Defendant Rotwein and the Record Owners to withhold plaintiff's proceeds upon the sale of the 1500 Building. Bell started taking steps to protect his interest shortly thereafter. That short period of time is not enough to cause Defendant Rotwein any prejudice. See *Gull Airborne Investments*, 694 F.2d at 843, 224 U.S.App.D.C. 272 (if only a short period of time elapses between accrual of the claim and the suit, the magnitude of prejudice required to apply laches is great). Therefore, Defendant Rotwein's defense of laches should be denied.

    **B.**    **The Statute Of Limitations Runs From the Accrual of the Cause Of Action Based On Breach Of Duty Or Contract, And Will Not Run If The Parties Merely Clarify Terms, Agree To New Or Restated Terms, Or Even Where One Party Repudiates Its Obligation Without Actually Breaching**

Any legal (as distinguished from equitable) claim is subject to the statute of limitations. The statute runs from the date of the accrual of the cause of action or, where the breach is not immediately discoverable, from the later date on which it was – or ought to have been – discovered. *Burka v. Aetna Life Ins. Co.*, 56 F.3d 1509, 1514 (D.C. Cir.1995) (statute of limitations does not run until the injured party should have known of the breach). The plaintiff may – but is not required to – sue for anticipatory breach or repudiation if, before an actual breach, the defendant makes clear his intention not to perform. *Franconia Associates v. United States*, 536 U.S. 129, 143 (2002).

Here, Rotwein asserts a statute of limitations defense with regard to Bell's contract claim

(Count VI) and such portion of his breach of fiduciary duty claims as derive from Rotwein's role as personal representative of Joseph Rotwein.    Against the former, she asserts the 3 year limitation period from D.C.Code Ann. §12-301.    Against the latter she asserts a combination of D.C.Code Ann. 20-1301(c) and 1303(a), arguing that her role as personal representative ended 3 years after her appointment, the "date of distribution of all the assets and satisfaction of all known claims against the estate" is assumed to be 3 months later, and a claim of personal liability must be made within one year thereafter – except for fraud.

> ### 1.    The Contract Claim Is Not Barred Because There Has Yet To Be An Actual Breach To Start The Time Running: Bell Is Merely Exercising His Option To Sue Based On Rotwein's 2006 Repudiation

As alleged throughout the Complaint, both Joseph Rotwein and Defendant Rotwein have at all times paid to Bell or his predecessor the full 10% of all income and capital attributable to his 10% interest in the Rotwein one third of the 1500 Building Syndicate.    There was simply no breach to cause the statute of limitations to begin running.    What is asserted in this case by Bell is a claim for *anticipatory breach*, sometimes referred to as repudiation.    The fact of repudiation does not start the statute of limitations running.    There still must be an actual breach. Nevertheless, repudiation does give a claimant the right – but not the obligation – to file suit before the actual breach.

The point was made abundantly clear in *Franconia Associates v. United States*, 536 U.S. 129 (2002).    In *Franconia*, the relation between the government and the plaintiff was to be governed by principles of general contract law.    Thus, the holding is fully applicable here.    The government enacted ELIHPA[6] in 1988, which effectively voided prepayment provisions in existing loans given under government programs, even though the government had previously been contractually obligated to accept prepayments.    When suit was brought against the

---

[6] "**E**mergency **L**ow **I**ncome **H**ousing **P**reservation **A**ct"

government in 1991 under the Tucker Act,[7] the government asserted the defense of the 6 year

statute of limitations.    The Court of Federal Claims dismissed and the Federal Circuit agreed.

But the Supreme Court reversed, holding that the passage of ELIHPA was not a breach of the

obligation to accept prepayments, but merely a repudiation of that obligation.    As such, the

statute of limitations did not begin to run.

> Justice Ginsburg, for a unanimous Supreme Court, wrote:

>> Failure by the promisor to perform at the time indicated for performance
>> in the contract establishes an immediate breach. . . . But the promisor's
>> renunciation of a "contractual duty *before* the time fixed in the contract for ...
>> performance" is a repudiation. . . . Such a repudiation ripens into a breach prior
>> to the time for performance only if the promisee "elects to treat it as such." . . . .
>>                   *        *        *
>> Unless petitioners treated ELIHPA as a present breach by filing suit prior
>> to the date indicated for performance, breach would occur when a borrower
>> attempted to prepay, for only at that time would the Government's responsive
>> performance become due.
>>                   *        *        *
>> To recapitulate, "[t]he time of accrual ... depends on whether the injured
>> party chooses to treat the . . . repudiation as a present breach." 1 C. Corman,
>> Limitation of Actions § 7.2.1, p. 488 (1991). If that party "[e]lects to place the
>> repudiator in breach before the performance date, the accrual date of the cause
>> of action is accelerated from [the] time of performance to the date of such
>> election." *Id.,* at 488-489. But if the injured party instead opts to await
>> performance, "the cause of action accrues, and the statute of limitations
>> commences to run, from the time fixed for performance rather than from the
>> earlier date of repudiation." *Id.,* at 488.
>>                   [536 U.S. at 143, emphasis in original; citations omitted]

**The 1987 Correspondence**.  In the present case, the only event, other than the lawyer

correspondence of 2006 and 2007, that even hints of a possible dispute was the exchange of

letters between Albert Bell and Joseph Rotwein in 1987.   In that exchange, Albert Bell learned

that his original assignment document (a copy of which Joseph Rotwein had already given him)

had been obtained by Rotwein from the files of his brother, Martin Bell, to whom it had been

entrusted by both years earlier.   Albert Bell wrote to Joseph Rotwein, asking that it be given to

---

[7] 28 U.S.C.A. 1491.

him.   Joseph Rotwein responded, reminding Albert Bell of the reason the original had been placed in Martin Bell's hands[8] and of the business reason for not wanting the original to be recorded.   Joseph Rotwein also offered to give back the original document if Albert Bell would enter into a management agreement such as some Bell Assignees had signed, which even Rotwein acknowledges, "accomplished the same result."   [Rotwein Brief at 7]   That management agreement expressly provided for the signatory to receive his "proportionate share of the proceeds from operation *or from any disposition*" of the property. [Complaint, Ex. F, p. 3.]

Thus, Joseph Rotewein never repudiated anything: instead he reaffirmed Albert Bell's right to his share of the proceeds of disposition, and to "derivative" rather than record title.   The exchange, which ended with nothing being done differently, is best viewed as a reaffirmation of the existing agreement and duties of the parties.   But, if anything was changed, the result merely effected a novation, giving rise to a new agreement.

Indeed, regardless of whether or not the arrangement between Albert Bell and Joseph Rotwein took on new and restated terms after Joseph Rotwein's July 27, 1987 letter to Albert Bell, Joseph Rotwein's words and actions defined the terms of an implied-in-fact contract between him and Albert Bell.  See *Braude & Margulies, P.C. v. Fireman's Fund Ins. Co.*, 468 F.Supp.2d 190, 198 (D.D.C. 2007) (implied-in-fact contract differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt).

When Joseph Rotwein died and Defendant Rotwein became his successor in interest, she continued to acknowledge and act in conformity with the terms of that implied-in-fact contract

---

[8] The 1987 letters suggest that Albert Bell saw Martin Bell as holding the original paper for him, while Joseph Rotwein saw Martin Bell as holding it for him.   This is not a conflict, as an escrowee always has obligations to both parties to the related agreement and is, indeed, holding the stakes for each.

(and/or a new one of her own) by continuing to account to Bell for his 10% share of distributions. Only when she communicated unequivocally through her attorney that she did not intend to make such an accounting to plaintiff for the proceeds of the sale of the 1500 Building and/or Lot 831 [*Compl.* ¶153] was there a repudiation. Once that repudiation was made, Bell had the option of continuing to wait for an actual breach by non-payment, or filing suit. He elected to sue. Only then was there a breach that could start the limitations period running. *See Franconia, supra* (an anticipatory repudiation ripens into a breach only if the promisee elects to treat it as such).

In short, when the 1987 exchange was over, both Joseph Rotwein and Albert Bell were satisfied, payments of income and capital continued to be made routinely, and life went on. Nothing was repudiated or breached. But, under the principle explained by the Supreme Court in *Franconia*, even if there had been a repudiation in 1987, no statute of limitations could have begun to run because there was as yet no breach. Joseph Rotwein, and after him Defendant Rotwein, continued to pay the 10% representing Albert Bell's "proportionate share of the proceeds" of every distribution of income and capital from the 1500 Building Syndicate.

Thus, Rotwein's statute of limitations defense is without merit because (a) there was not even a repudiation in 1987; (b) any adjustment of the arrangement (e.g. Joseph Rotwein as escrowee in place of Martin Bell) would at most be a novation giving rise to a new implied in fact contract; and (c) even if there was a repudiation, there was no breach as the Rotweins continued to account for the 10% interest of Albert Bell and the Bell Trust, and no statute of limitations could begin to run.

## 2. The Fiduciary Claim Based On Defendant Rotwein's Role As Personal Representative Is Not Barred

The other limitations issue raised by Rotwein relates to the role played by Rotwein as her

late husband's personal representative.   The statutory provisions relied upon are 20-1301(c),

which enacts that, where there is no certificate of completion, the personal representative's

appointment terminates 3 years after appointment; and 20-1303(a) which, in pertinent part, reads

as follows:

> (a) Proceedings against personal representative.  Unless otherwise barred, any
> claim of personal liability against a personal representative, except for fraud,
> and except as provided in section 20-736, shall be barred one year from the date
> of distribution of all the assets and satisfaction of all known claims against the
> estate.  Unless shown by the personal representative too be earlier, the date of
> such distribution and satisfaction in an unsupervised administration shall be
> deemed to be the date of the filing of the Certificate of Completion or, if none, 3
> months after the termination of the appointment of the personal representative.

Rotwein urges that this provision is an absolute limitation, wiping out all claims against a

personal representative, even when the personal representative has taken and retained property

that never belonged to the deceased.   She is wrong.  First of all, the claim asserted by Bell for

the recovery of the 10% interest is not even a claim for "personal liability."   It seeks only return

of an asset belonging to him that was taken and is still held by Rotwein under color of her

official capacity but without any equitable right to do so.   If the 10% interest were a chattel such

as a piece of furniture, this might be a suit in replevin.

Second, the 10% interest was never equitably owned by the deceased.   He held nominal

title as a fiduciary, so that the 10% interest could never become an asset of his estate.   The

situation is as if Rotwein had looked into Joseph Rotwein's safe deposit box and found a

cashier's check to Albert Bell from a title company that had been held in escrow by Joseph

Rotwein, who was an attorney.   From that moment, she would have been subject to a fiduciary

duty to the owner of that check either (a) to discharge the duties of escrowee or (b) to return it so

that it could be placed with a different escrowee.   She is not permitted to simply pocket the

check.

Third, her obligations did not end when she closed the estate.   The District of Columbia code sets forth in relevant part that any claim of personal liability against a personal representative is barred one year from the date of *distribution of all the assets* and satisfaction of all known claims against the estate.  D.C. Code Ann. § 20-1303(a) (emphasis added).   This is presumed ("deemed") to be 3 years after appointment, but that presumption is rebuttable under the statute.  See D.C. Code Ann. § 20-104 ("Unless otherwise expressly provided, whenever this title states that a fact shall be presumed, the presumption is rebuttable.")   The Complaint rebuts the presumption.   As alleged by Bell, Rotwein never distributed the 6.67% (20% of one-third) belonging to Bell and Sleepy Hollow.   That portion, even today, remains in her name and that of Bank of America, her co-personal representative.   She only distributed (to herself) the remaining 26.67% (80% of one-third) that had been equitably and legally owned by her late husband.

Therefore, if the Bell 10% was property of the deceased and of his estate, Rotwein has still not distributed "all the assets" and the limitations period has therefore never begun to run.  If, on the other hand, the 20% not distributed to her was ***not*** an asset of the estate, the statute of limitations may indeed have begun to run on the estate, but not on her illegal retention of the 10% interest which, if it was not an asset of the estate, she has no right to retain.   She cannot have it both ways.

Simply put, Defendant Rotwein had the duty to do one of two things:  First, she could have given Albert Bell back his original Assignment to his 10% interest in her late husband's one-third share of the 1500 Building and adjacent lot, or a replacement if she or her late husband truly lost it.  Second, she could have transferred the 10% to someone (whether herself or another) under terms requiring them to hold it as a trustee for Bell, in the same manner Joseph Rotwein had held it.   Her failure to do so was at least a conversion of Bell's property or malpractice as

personal representative.

Moreover, the termination of a personal representative's tenure does not reduce the personal representative's duty to protect property subject to the representative's control and to account for such property. See D.C. Code Ann. § 20-523; *In re Estate of Green,* 912 A.2d 1198, 1210 fn. 38 (D.C. Ct. App. 2006) (termination does not reduce personal representative's duty to protect property subject to the representative's control, and to account for and deliver such property to the successor representative); *see also In re Estate of King*, 769 A.2d 771, 778, fn. 8 (D.C. Ct. App. 2000) (a personal representative is personally liable for any breach of his or her fiduciary duty to interested persons); *Godette v. Estate of Cox*, 592 A.2d 1028, 1035 (D.C. Ct. App. 1991) (if any personal representative's exercise of power concerning the estate is improper, such representative is liable for breach of fiduciary duty to interested persons for resulting damage or loss to the same extent as a trustee of an express trust). [9]

## IV.  Rotwein's Attempt To Repudiate Her Fiduciary Duties Is Unavailing

Defendant Rotwein attempts to sweep Bell's claims breach of fiduciary duty claims under the rug by contending all of those claims are actually claims against Joseph Rotwein.  That is contrary to the Complaint, which accuses Joseph Rotwein of nothing.   Defendant Rotwein's fiduciary duties arose in several ways: (a) her role as successor of her late husband, both through her role as personal representative and as successor holder of an interest that was from its inception impressed with a trust in favor of Bell and his predecessor; and (b) by reason of her own position of dominance and trust over Bell in regard to the assigned interest.   The fiduciary

---

[9] In any event, even if most of plaintiff's claims against Defendant Rotwein as a personal representative were barred by the prescribed limitations period in section 20-1303(a) (which they are not), Bell's claim for fraud would not be barred.  D.C. Code Ann. §20-1303(a) (limitations period on proceedings against a personal representative does not apply to fraud claims).

duties[10] arising out of these relationships were breached by Rotwein when she stated her

intention to deprive Bell of the liquidation proceeds of the assigned interest.

> **A.    Rotwein, As Personal Representative Of Joseph Rotwein, Has A Fiduciary Duty Toward Bell To Account For Property Owned By Bell But Held In Her Name**

> **1. Joseph Rotwein Had A Fiduciary Duty To Albert Bell**

Joseph Rotwein took on the role of Albert Bell's trustee when he obtained possession of

the original assignment that he had previously given to Albert Bell and delivered in escrow to

Martin Bell.   At that time, he promised Albert Bell that he would keep the original executed

assignment document in the equivalent of a continued escrow for the benefit of Albert Bell.

Compl. ¶¶ 135-136.  *See Fielding v. BT Alex Brown*, 116 F. Supp. 2d 59, 63 (D.D.C. 2000) (no

particular form of words or conduct is necessary to manifest an intention to create a trust; the

creation of a trust can be accomplished through written or spoken language or by conduct);

*Cabaniss v. Cabaniss*, 464 A.2d 87, 91 (D.C. Ct. App. 1983) (an enforceable trust can be created

without a writing).

As such a trustee, Joseph Rotwein had a fiduciary duty to Bell.  *In re Estate of Green*,

912 A.2d 1198, 1210 (D.C. Ct. App. 2006) (the trustee is in a fiduciary relation to the beneficiary

and as to matters within the scope of the relation he is under a duty not to profit at the expense of

the beneficiary), *citing* Restatement of Trusts § 170.  Therefore, he had a fiduciary duty to keep

Bell's assignment instrument, as well as the rents, profits, and capital of Bell's interest in the

1500 Building, safe.  Furthermore, Joseph Rotwein had the duty not to profit at Bell's expense.

---

[10] Defendant argues that the "[e]xistence of a fiduciary relationship is a question of fact." See Motion to Dismiss, p. 12.  To that extent, dismissal of plaintiff's claims based on a breach of fiduciary duty would be improper at this stage of litigation.  Furthermore, defendant's citation to *Egan v. McNamara* has no relevance here.  In *Egan*, the question was whether an attorney owed his fiduciary duty to the corporation that retained him or to a party to a buy-sell agreement involving the corporation.  There is no similar inquiry here.

*Id.* Joseph Rotwein also had a fiduciary duty toward Albert Bell arising out of his position of dominance and trust. Joseph was a friend, was present in the locale of the investment, was deeply involved in its management, and was a sophisticated attorney. Albert Bell, on the other hand, was living in Illinois, 1000 or more miles away, and relied on Joseph Rotwein's probity, expertise, and good will.

Thus, Joseph Rotwein owed the general fiduciary duties of loyalty and care to Albert Bell. In this and other contexts, where one party is in a dominant position, the dominant party owes a fiduciary duty to the non-dominant party. *See Air Line Pilots Ass'n, Intern v. O'Neill*, 499 U.S. 65, 75, 111 S.Ct. 1127, 1134 (1991) (a trustee owes fiduciary duties to trust beneficiaries; corporate officers and directors owe fiduciary duties to shareholders; lawyers owe fiduciary duties to clients) (internal citations omitted). A fiduciary, bound by a duty of loyalty, must not engage in any form of self-dealing or misuse his office for personal gain. *Id., citing Graham v. Taylor Capital Group, Inc. (In re Reliance Sec. Litig.)*, 91 F.Supp.2d 706, 732 (D. Del. 2000). Furthermore, a fiduciary's duty of care dictates that the fiduciary must act on an informed basis and with the honest belief that he is acting in the best interests of the corporation. *Id.* These same ideas apply here, where the Joseph Rotwein held a position similar to that of a Director of a corporation or general partners of a limited partnership, and the Bell and Rotwein assignees have roles similar to shareholders or limited partners.

A general partner of a partnership (the existence of which is alleged in Count I) owes a duty to the other partners to act in a fiduciary capacity. *See TMG II v. U.S.*, 778 F.Supp. 37, 47 (D.D.C. 1991), *citing Libby v. LJ Corp.*, 247 F.2d 78, 81 (D.C. Cir. 1957). One of a general partner's duties is to carefully account for all partnership property. *Id.* As set forth above, the Bell investment in the 1500 Building Syndicate is properly alleged to be a partnership, in which

the Rotweins have acted as general partners holding partnership assets as nominees, and the assignees have acted as limited partners. Compl. ¶ 23. In such a partnership, partners have a duty to make a full and fair disclosure to other partners of all information which may be of value to the partnership. *Day v. Sidley and Austin*, 394 F.Supp. 986, 993 (D.D.C. 1975), citing 1 Rowley on Partnership § 20.2, at 512-13 (2d ed. 1960).

Two of the basic fiduciary duties in a partnership are that: 1) a partner must account for any profit acquired in a manner injurious to the interests of the partnership, such as commissions or purchases on the sale of partnership property; and 2) a partner cannot without the consent of the other partners, acquire for himself a partnership asset. *Id.* Indeed, the plan of Defendant Rotwein and the other Record Owners to acquire and distribute to themselves the proceeds of the sale of the 1500 Building and to refuse to account to Bell and Sleepy Hollow for those proceeds, is a flagrant breach of such a duty. *See Weil v. Markowitz*, 829 F.2d 166, 173 (D.C. Cir. 1987) (acknowledging that a general partner has a duty to render an accounting to limited partners). Furthermore, a general partner must exercise the highest degree of honesty and good faith in his handling of partnership assets. *In re Wolensky's Ltd. Partnership*, 163 B.R. 615, 622 (Bkrtcy. D. Dist. Col. 1993), citing *Labovitz v. Dolan*, 189 Ill. App. 3d 403, 408-09, 412-13, 545 N.E.2d 304, 308, 310 (1989).

There is no indication that Rotwein ever failed to acknowledge or perform these duties, or to discharge his responsibility for safeguarding Albert Bell's investment. Unfortunately, Defendant Rotwein, his widow, appears to have less regard for her duties than did her late husband.

### 2. As Personal Representative, Rotwein Was Obligated To Discharge Joseph Rotwein's Fiduciary Duties

When Joseph Rotwein died, Defendant Rotwein became successor to Joseph's fiduciary

duties in respect of the 10% interest that belongs to Bell but had been in Joseph's name. Compl ¶ 54-55. *See Smith v. Metropolitan Life Ins. Co*., 320 F.2d 778, 781 (D.C. Cir. 1963), citing *De Valengin's Adm'rs v. Duffy*, 39 U.S. 282, 290, 10 L.Ed. 457 (1840) ("We are of the opinion, that whatever property or money is lawfully recovered or received by the executor or administrator, after the death of his testator or intestate, in virtue of his representative character, he holds as assets of the estate; and he is liable therefore, in such representative character, to the party who has a good title thereto"); *see also Holliman v. J.Q. Demoville*, 243 Miss. 542, 547 (1962) (while the administrator of the deceased trustee may be entitled to the possession of the trust funds, he must account for them to the *cestui que trust*), *citing* Am. Jur. p. 483, Sec. 202.

Thus, Defendant Rotwein, as personal representative, stepped into Joseph Rotwein's shoes with respect to his fiduciary duties to Bell. Such a trustee has a duty of loyalty to a beneficiary, and must administer the trust solely in the interests of the beneficiaries. D.C. Code Ann. § 19-1308.02(a). Should a trustee breach her duty, she is liable to the beneficiary affected for the greater of (1) the amount required to restore the value of the trust property and trust distributions to what they would have been had the breach not occurred; or (2) the profit the trustee made by the reason of the breach. *Id.* Furthermore, a trustee can be enjoined from committing a breach of trust; compelled to redress a breach of trust by paying money, restoring property, or other means; and ordered to account for trust property. D.C. Code Ann. § 19-1310.01(b)(2)-(4). In addition, a constructive trust can be imposed on trust property, and the proceeds of trust property can be recovered. D.C. Code Ann. § 19-1310.01(b)(9).

As discussed earlier, the mere act of closing an estate does not end this fiduciary duty. Under D.C. law, the termination of a personal representative's tenure does not reduce the personal representative's duty to protect property subject to the representative's control and to

26

account for such property.  See D.C. Code Ann. § 20-523;  *In re Estate of Green,* 912 A.2d at 1210, fn. 38 (termination does not reduce personal representative's duty to protect property subject to the representative's control, and to account for and deliver such property to the successor representative); *see also In re Estate of King*, 769 A.2d at 778, fn. 8  (a personal representative is personally liable for any breach of his or her fiduciary duty to interested persons); *Godette*, 592 A.2d at 1035 (if any personal representative's exercise of power concerning the estate is improper, such representative is liable for breach of fiduciary duty to interested persons for resulting damage or loss to the same extent as a trustee of an express trust).

**B.    Rotwein, As Successor In Title Of Joseph Rotwein, Has The Same Fiduciary Duty Toward Bell With Respect To Property Held As Nominee As Did Joseph**

As shown above, Joseph Rotwein certainly had and acknowledged a fiduciary duty to preserve, protect, and account for the 10% interest that was in his possession but owned by Albert Bell.  That fiduciary duty was part and parcel of his holding title to the record interest. Had the business of the Syndicate operating the 1500 Building not required the original document to remain unrecorded, there might not have been any fiduciary duty beyond that ordinarily owed by management of a business enterprise to its investors.   In essence, Joseph Rotwein was either the agent of Albert Bell to hold, manage, and account for his investment, or, what is very similar, the managing partner of a partnership with Albert Bell and Mayer.   When Joseph Rotwein died, Defendant Rotwein succeeded to his positions, both as titleholder of the property impressed with the trust and as managing partner of the Rotwein-Bell-Mayer investment partnership.   As such, the fiduciary obligations of her late husband became hers.

**C.    Independently Of Her Roles As Personal Representative And Successor Of Joseph Rotwein, Defendant Rotwein Owes A Fiduciary Duty To Bell Arising From Her Own Dominant Position**

Not only does Defendant Rotwein hold Bell's 10% interest as a successor in interest to Joseph Rotwein, but she owes an independent fiduciary duty arising out of her position of dominance and trust toward Bell.   Outside of any fiduciary duties she owes to Bell in a representative capacity, she owes a fiduciary duty to Bell as a dominant party in the relationship, the same type of fiduciary duty that Joseph Rotwein owed to Bell when he was alive.  *See Memorandum in Opposition* §III.A.1, *supra*.

Bell has relied on Defendant Rotwein's actions and representations in her fiduciary capacity for over 15 years now.  He has received distributions and accountings from the estate of Joseph Rotwein and then from Rotwein herself, and directly from the management of the 1500 Building.  These always accounted for Bell's *pro rata* share of the Building's capital and income.   Bell then relied on these accountings and distributions to file the Trust's taxes and income statements.   That is clearly reliance – certainly enough to survive a motion to dismiss under the Federal Rules of Civil Procedure.

Defendant Rotwein cites *General Films, Inc. v. Sanco Gen. Manu. Corp.*  in support of her argument that she does not owe a fiduciary duty to a party in connection with the transaction. *See* Motion to Dismiss, p. 13.  However, in that case, the plaintiff alleged that a woman who had no involvement in a corporation other than being a figurehead owed a fiduciary duty to plaintiff similar to that her husband had owed.  Here, Francis Rotwein is not just a "figurehead" in the Syndicate, with no involvement.  She has been a member of the Syndicate for years.  It does not matter how she obtained her interest in the 1500 Building.  The fact is, she has been involved in the Syndicate since Joseph Rotwein's death, and therefore has established her own independent fiduciary duty to plaintiff.

Defendant Rotwein, through her actions, has allowed and encouraged Bell to continue to

expect and rely upon those payments and accountings for any rents and profits from the 1500

Building.  As the dominant party in the relationship for over 15 years, with 26.67% interest in the

Building and the Syndicate, and direct control over management of the Building and Syndicate

and over the distributions being made to Bell, and 80% ownership of the Rotwein-Bell-Mayer

joint investment, Defendant Rotwein has assumed a fiduciary duty of loyalty to Bell.  *See In re*

*Greater Southeast Community Hosp. Corp.*, 353 B.R. 324, 344-45 (Bkrtcy. D.D.C. 2006).

### D.    Rotwein's Actions And Threats Constitute Breach Of These Fiduciary Duties

As a fiduciary, Rotwein cannot engage in self-dealing by selling one third of the 1500

Building and keeping Bell's rightful 10% of the proceeds for herself.  *Id.*  Yet she has stated that

she intends to do so.   Furthermore, she has a duty to carefully account for all partnership

property.  *See TMG II*, 778 F.Supp. 37, 47 (D.D.C. 1991).  Her plan to sell the 1500 Building

without accounting to Bell for his share of the proceeds is certainly a violation of that fiduciary

duty.  See Compl. ¶ 96.  Defendant Rotwein also has the duty to make a full and fair disclosure

to other partners of all information which may be of value to the partnership.  *Day v. Sidley and*

*Austin*, 394 F.Supp. at 993.  Defendant Rotwein's failure until 2007 to disclose her plan to

repudiate the Bell 10% interest, and her making of routine distributions for 15 years or more

evidences a plan to lull Bell into not taking action to protect his right to the **Big** payment (the

liquidation proceeds) – at least until she had the proceeds of Bell's 10% in her pocket.  In fact,

Bell only learned about the possible sale from a family member associated with the Martin Bell

share.  Compl.¶ 96.  This clearly alleges a breach of the duty to make full disclosure.   And, by

now demanding that Bell show record title, even though it was never contemplated to record it

until business considerations permitted, Defendant Rotwein has not only breached, but

repudiated her trust.   Finally, her express statement, through counsel, that she will not continue

to account to Bell for his interest in the Building and/or Syndicate, is a further breach of her

fiduciary duties.  Compl ¶ 98.

  E.    **Because Of Her Breaches, Defendant Rotwein Also Holds the Bell 10%
          Under A Constructive Or Resultant Trust, Giving Rise To Further Fiduciary
          Duties**

      Defendant Rotwein has repudiated her duty to account for the 10% interest to its true

owner, Bell.  Therefore, a constructive trust should be imposed on Bell's interest in the 1500

Building and Syndicate, to hold that interest for Bell's benefit.  A breach of fiduciary duty often

gives rise to the creation of an equitable constructive trust, whereby an errant fiduciary is deemed

to hold in trust property misappropriated from the beneficiary. *TMG II v. U.S.*, 1 F.3d 36, 40

(D.C. Cir. 1993).   A constructive trust has been created by Defendant Rotwein's assertion that

she will not properly account for specific partnership property entrusted to her as a general

partner.  *See TMG II v. U.S.*, 778 F.Supp. 37, 41 (D.D.C. 1991); *Hertz v. Klavan*, 374 A.2d 871,

873 (D.C. 1977).  In fact, whenever the legal title to property is obtained through means or under

circumstances which render it unconscientious for the holder of the legal title to retain and enjoy

the beneficial interest, equity impresses a constructive trust on the property in favor of the one

who is truly and equitably entitled to the property, even if he never had legal title to the property.

*Harris Trust and Savings Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 250-51, 120 S. Ct.

2180, 2189 (2000), *citing Moore v. Crawford*, 130 U.S. 122, 128, 9 S.Ct. 447 (1889).

      Furthermore, a resulting trust should also be imposed.   A resulting trust is a property

relationship which effectuates the parties' intent when one party takes title to property for which

another has furnished consideration.  *In re Crossroad Health Ministry, Inc.*, 319 B.R. 778, 781

(Bkrptcy. D.D.C. 2005) *citing Edwards v. Woods*, 385 A.2d 780, 783 (D.C. 1978) (the equitable

remedy of a resulting trust must be applied to effectuate justice where one individual paid the

purchase price for real property, but another individual took formal title to that property).  Here, Albert Bell furnished the $20,000 consideration for his one tenth of Joseph Rotwein's one third interest in the 1500 Building.  Compl. ¶ 13.  After Martin Bell died, Joseph Rotwein came to hold Albert Bell's original assignment document, and held onto it for reasons having to do with the Syndicate's business model.  Compl. ¶ 43.  Record title to the interests assigned by Joseph Rotwein to Albert Bell remains in the name of Defendant Rotwein, who has refused to return the original assignment to Bell or to acknowledge his 10% interest in the Building and the Syndicate with regard to liquidation proceeds.  Compl. ¶¶ 68, 99, 103-04.  Albert Bell gave consideration for title to property that is now in the hands of another.  A resulting trust should be imposed to effectuate the intent of Albert Bell and Joseph Rotwein (that Albert Bell would receive his pro rata share of any and all proceeds of the 1500 Building and Syndicate).

**V.     Bell's Count For Breach Of Contract States A Claim**

**A.     Rotwein is a Party to the Complaint**

Defendant claims that Rotwein is not a party to the contract, and therefore there can be no action for breach of contract against her.  However, as has already been explained, Defendant Rotwein is a party to a contract implied-in-fact.  (See *supra*, §III.B.1.).  Additionally, in her capacity as personal representative, Defendant Rotwein had the power and obligation to "perform [Joseph Rotwein's] contracts that continue as obligations of the estate, and *execute and deliver such deeds or other documents under such circumstances as the contract may provide*[.]" D.C. Code Ann. § 20-741(3).

**B.     Plaintiff Alleges a Cause of Action for Breach of Contract**

Here, of course, there was a contract (the original oral investment agreement whereby Joseph Rotwein took $20,000 from Albert Bell in exchange for an assignment of 10% of his one-

third, and agreed to hold title in Albert Bell's interest).   Whether modified or merely affirmed by the 1987 correspondence, that contract existed and the related fiduciary duty continued as an obligation of the estate after Joseph died.   Rotwein therefore had the right and obligation to perform the contract and to discharge the fiduciary duty of her deceased or, in the alternative, to see to it that someone else became obliged to do so.

Specifically, in 1956, Bell and Joseph Rotwein agreed that in exchange for Bell's payment of $20,000 to Rotwein, Bell would receive an assignment of Rotwein's one third interest in the 1500 Building, for which Bell would receive income and profits prorated for his percentage of interest.  Compl. ¶ 151.  Bell and Rotwein also agreed that when Rotwein's interest in the 1500 Building was sold, Bell would receive a prorated percentage of the net proceeds of sale.  *Id.*  As the successor-in-interest and former personal representative of Joseph Rotwein, Defendant Rotwein owes Bell the duty to perform that contract.  Compl. ¶ 152.  However, Defendant Rotwein anticipatorily breached that duty by communicating unequivocally through her attorney that she does not intend to account to Bell for the proceeds of the sale of the 1500 Building and/or Lot 831.  Compl. ¶ 153.  Therefore, Defendant Rotwein has anticipatorily breached the contract that she, as Joseph Rotwein's successor in interest, had the duty to honor.  Compl.¶ 153-154.

## VI.    Bell Sufficiently Pleads Actual Fraud By Rotwein, And Any Missing Information Is Under The Exclusive Control Of Rotwein

### A.    The Elements of Actual Fraud

Plaintiff sufficiently pleads fraud under Rule 9(b).  In order to state a claim for actual fraud, plaintiff must allege (1) a false representation; (2) concerning a material fact; (3) made with knowledge of its falsity; (4) with the intent to deceive; (5) upon which reliance was placed. *Morris v. Buvermo Properties, Inc.*, 510 F.Supp.2d 112, 119 (D.D.C. 2007).  Rule 9(b) requires

that in "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). To satisfy Rule 9(b), the "pleader must state the time, place and content of the false misrepresentations, the fact[s] misrepresented and what was obtained or given up as a consequence of the fraud.." *United States ex rel. Joseph v. Cannon,* 642 F.2d 1373, 1385 (D.C.Cir.1981). Although the particularity requirement distinguishes fraud claims from ordinary civil pleadings, Rule 9(b) is still subject to the general "short and plain statement" command of Rule 8. *United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.,* 389 F.3d 1251, 1256 (D.C.Cir.2004) (explaining that Rule 9(b) is not the "antithesis" of Rule 8).

### B. Bell Alleges a Cause of Action for Actual Fraud

Defendant Rotwein contends that plaintiff has not adequately pleaded fraud. This is incorrect. Bell has alleged fraud with sufficient particularity to survive this motion to dismiss. Bell alleged that, at a time after destroying the assignment instrument or causing it to be destroyed, Defendant Rotwein, through her continuous payment of Bell's pro rata share, continued to represent by her conduct that she had and was still safeguarding the instrument and Bell's 10% interest. Compl. ¶158. Her representation was material because it led Bell to do nothing further to protect his interest in the Building. Compl. ¶¶ 158-59, 161. Defendant Rotwein argues that the uncertainty around the circumstances of the disappearance of the missing document should bar Bell's claim for actual fraud. But, getting rid of the evidence is not the only fraud. The fraud is her repeated statements by conduct that she held Albert Bell's original assignment and recognized his 10% interest. The conduct was her continued distribution of a *pro rata* share of proceeds to Albert Bell and/or the Trust. Compl. ¶¶ 75-79, 84-85, 88-89.

Defendant Rotwein knew at some point the document no longer existed because she could not find it among her late husband's papers or herself disposed of it; and she knew she

intended to keep all the proceeds of disposition.   Yet, she continued to pay Bell his pro rata share in order to deceive him into thinking he needed to take no further steps to protect his right to the big payout on disposition.  Compl. ¶ 158.  In reliance on Defendant Rotwein's misrepresentations by conduct, Bell took no further action – which turned out to be to his detriment. Compl. ¶¶ 158-59, 161 .  Defendant Rotwein simply led Bell on, right up to the eve of sale of the Building, and then cut him and the other Rotwein assignee out of the deal.

Therefore, Bell has pleaded this fraud with requisite particularity.  Plaintiff alleged the time of the fraudulent activity (after Rotwein's death and on the occasion of each payment, see Compl. ¶ 158 and ¶¶ 75-95); the place of the fraudulent activity (the situs of Bell's assignment document among the Rotwein papers, Compl. ¶ 158); the content of the false misrepresentation (that the document was still in existence and the 10% interest was still recognized, as evidenced by Defendant Rotwein's continuous payment to Albert Bell of his pro rata share of 1500 Building and Syndicate rent and profits, Compl. ¶¶ 75-95); and what was obtained or given up as a consequence of the fraud (the Bell Trust's ability to obtain the actual present value of the investment has been interfered with, Compl. ¶¶ 159, 161).

Therefore, plaintiff's fraud claim does not rest solely on information and belief as defendant Rotwein contends.  While plaintiff does allege that plaintiff "believes" that Defendant Rotwein caused the original assignment to be destroyed (Compl. ¶ 158), that allegation is merely a way of presenting the scenario that the original assignment was admittedly in the Rotweins' hands; then it wasn't.   When part of a fraud is effected secretly, the plaintiff cannot be required to guess a date for the clandestine destruction of his property.   Taken with Bell's more particular allegations of misleading representations by conduct (i.e., payments) as well as custody and unexplained disappearance, easily overcomes the Rule 9(b) hurdle. *See Avianca, Inc. v. Corriea*,

1991 WL 496132, at *3 (D.D.C. May 31, 1991) (finding plaintiff pleaded fraud with requisite particularity, even when some allegations were "on information and belief," because allegations taken as a whole satisfied Rule 9(b)'s particularity mandate).

Furthermore, where a plaintiff alleging fraud is at a disadvantage because defendants control the relevant documents, the plaintiff may allege lack of access to meet the 9(b) particularity hurdle.  *See U.S. ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1258 (D.C. Cir. 2004); see also *Shields v. Washington Bancorporation*, 1992 WL 88004, at *4 (D.D.C. Apr. 7, 1992) (because plaintiffs often cannot know information that is peculiarly in the possession of the defendants, plaintiffs need only provide a statement of facts upon which the plaintiffs' allegations are based). Plaintiff here alleged that Joseph Rotwein had the original assignment, that Defendant Rotwein then had control over the assignment, and that Defendant Rotwein or another party secretly destroyed or secreted the original documents in order to deprive Albert Bell and the Mayer family of their rights.  Compl. ¶ 158.  Bell alleged that the disappearance of the original assignment was concealed by Rotwein's actions, and interferes with the ability of the Trust to obtain the actual present value of the investment.  Compl. ¶ 159. Bell pleaded lack of access to the document.  In fact, the lack of access to the document is the gravamen of that part of the actual fraud claim, along with the misrepresentations by conduct. For these reasons, plaintiff's motion to dismiss defendant's Actual Fraud claim should be denied.

## VII.    Bell Sufficiently Pleads Negligent Misrepresentation By Rotwein

### A.    The Elements of Negligent Misrepresentation

In order to properly plead negligent misrepresentation, a plaintiff must plead that (1) the defendant made a false statement or omission of fact; (2) the statement was in violation of a duty to exercise reasonable care; (3) the false statement or omission involved a material issue; (4) the

plaintiffs reasonably relied to their detriment on the false information and (5) the defendant's challenged conduct proximately caused injury to the plaintiffs. *Burlington Ins. Co. v. Okie Dokie, Inc*., 329 F.Supp.2d 45, 48 (D.D.C. 2004).

### B.    Bell Has Alleged A Cause Of Action For Negligent Misrepresentation

Bell has set forth a claim for negligent misrepresentation. He alleged that, by continuing to send Albert Bell's and his portion of the rent income, other profits, and capital distributions of the 1500 Building and the Syndicate, and by not stating that she had (or would contend that she had) no record of Albert Bell's ownership of part of the 1500 Building, Defendant Rotwein was representing that she had possession of and was honoring record proof of Albert Bell's interest. Compl. ¶ 162-165.  Bell objectively and reasonably relied on her nondisclosures and actions. Compl. ¶ 165.  After all, regardless of Joseph Rotwein's explanation of the reason for preventing recordation of assignments, he had expressly acknowledged that Albert Bell's equitable (or "derivative" ownership in the building existed.  Compl. ¶ 43, Defendant's Ex. A. to Motion to Dismiss.  Defendant Rotwein continued to make the same representation every time she caused the 10% to be paid to Bell.  Compl. ¶ 164.  It was not unreasonable for Bell to conclude that Defendant Rotwein was paying him both because she acknowledged Bell was entitled to his 10%, and because she still possessed and was safeguarding the original document evidencing the fact that she was legally bound to do so.

That is at the heart of plaintiff's negligent misrepresentation claim.  The question is not whether Bell had reason to know years ago that he had only a "derivative" interest in the Building, as defendant argues. *See Motion to Dismiss*, pp. 18-21.  The question is whether plaintiff was "led on" by Defendant Rotwein's actions and omissions to his detriment, such that, in reliance on her conduct, he refrained from taking the steps he would otherwise have taken to

36

further protect his interest, whatever it is called, in the 1500 Building.   On this Rule 12(b)(6) Motion, where all allegations are deemed true and all inferences must be taken in favor of the plaintiff, the answer is that Bell _**was**_ led on in that way, and Rotwein's misrepresentations by conduct proximately caused injury to Bell.  Particularly, the Complaint sets forth that:

(1) After Joseph Rotwein died, Defendant Rotwein made repeated false representations by conduct that she recognized Bell's 10% interest in the building.   She did this by continuing to pay him and by concealing the fact that she no longer had (or at least would claim she no longer had) possession of, Bell's original assignment  (¶ 164);

(2) that these statements by conduct were in violation of Defendant Rotwein's ordinary and fiduciary duties as a successor-in-interest to Joseph Rotwein's estate and controlling owner to disclose that she had (or would contend she had) no record of, or intention to honor as to proceeds of sale, Bell's ownership rights to 10% of one third of the 1500 Building (Compl. ¶¶ 55, 164)

(3) that these false statements were material because they led Albert Bell (and later Bell) to omit taking steps to secure his property interest (Compl. ¶ 165);

(4) that Albert Bell's and Bell's reliance on Defendant Rotwein's actions was reasonable, because after scores of years of being paid regularly by Joseph Rotwein and Defendant Rotwein, they were given no reason to believe that this practice would change as to capital distributions when the building was sold unless he took further action (Compl. ¶¶ 163-164);

(5) that as a result of Defendant Rotwein's conduct and actions, Albert Bell did not take what would have been the necessary steps to protect his interest in the 1500 Building.  (Compl. ¶ 165).

Because plaintiff has adequately pled negligent misrepresentation against Defendant

Rotwiein, defendant's motion to dismiss should be denied.

**VIII. Albert Bell's And Bell's Reliance On Joseph Rotwein's And Rotwein's Performance Of Their Duties Over 50 Years Supports Equitable Estoppel**

    **A.    The Elements of Equitable Estoppel**

       The elements of an equitable estoppel claim are: (1) conduct amounting to a false representation or concealment of material fact (2) made with actual or constructive knowledge of the true facts, and (3) with the intention that another person act in reliance upon it; (4) the other person's lack of knowledge and of the means of knowledge concerning the truth of the representation, (5) and his reliance upon the misrepresentation, (6) causing him to act so as to change his position prejudicially. *Goldberg. Marchesano. Kohlman. Inc. v. Old Republic Sur. Co.,* 727 A.2d 858, 862 (D.C.,1999), citing *Cassidy v. Owen*, 533 A.2d 253 (D.C. 1987).   To the same effect are *American Century Mortgage Investors v. Unionamerica Mortgage and Equity Trust,* 355 A.2d 563, 565 (D.C.1976) and *Parker v. Sager,* 85 U.S.App.D.C. 4, 8, 174 F.2d 657, 661 (1949).   Moreover, it is not essential to the creation of an equitable estoppel that the party sought to be estopped should have had an actual intent to deceive, defraud, or mislead.   Nor is it essential that the representation or conduct relied upon be motivated by actual malice." *Goldberg, supra: Cassidy, supra*, both citing 28 AM.JUR.2d *Estoppel and Waiver* § 41, at 648 (1966).

    **B.    The Facts Alleged Here Meet All The Elements For Equitable Estoppel**

       Here, the **first element** is met by Bell's allegation that, for more than 50 years, Joseph Rotwein and Defendant Rotwein continued to pay Albert Bell, and then Bell as trustee, the full 10% of every distribution to either of the Rotweins from the 1500 Building Syndicate, whether for capital or income, and whether attributable to the building itself or to the lot purchased later. This conduct, if the Rotweins (or Defendant Rotwein alone) believed that there was no

obligation to account to Albert Bell and Bell as trustee for the liquidation proceeds of the 1500

Building, was inherently misleading.   The payment of an amount described variously as "10%

of Mr. Rotwein's share . . .", or "NOVEMBER DISTRIB.", or "represents payment to you of

your share of the cash distribution made to me today" [see Exs. K, Q to the Compl.] can only be

interpreted by the recipient as an acknowledgement that the recipient owned 10% of whatever

Joseph Rotwein had owned on the books of the Syndicate, and that the recipient would receive

the same percentage of the liquidation proceeds when the real estate was eventually sold off.

Indeed, when the recipient also received annual and periodic financial statements

identifying his 10% of the profits or losses of the syndicate as "ALBERT R. BELL – Share of

Profit:  10% of 1/3 . . . ", or instructing him to "apply your percentage of ownership to this

information" to prepare taxes [See Exhibit B to complaint], the only rational inference to be

taken by Albert Bell or Bell as trustee was that his interest was an actual present interest that

would entitle him to the same percentage of any liquidation proceeds.

Moreover, when the building was refinanced in 1973, Albert Bell received $90,000 as a

distribution in respect of the capital value (above and beyond debt and reserves) of the building.

This amount was exactly 10% of one third of $2,700,000, the amount of excess financing

proceeds being distributed to owners.

All of these acts by the Rotweins, if they believed that the Bells had no right to the capital

of this investment, amounted to "conduct amounting to a false representation or concealment of

material fact", i.e., the fact that Rotwein intended to deprive the Bells of their investment and to

contend that, somehow, the absence of "record" title to the underlying real estate deprived the

Bells of the right to liquidation proceeds.   The conclusion of "conduct amounting to a false

representation or concealment of material fact" is inescapable.   No-one pays someone 10% of

every distribution of capital or income over a 50 year period unless (a) the payor is acknowledging that the recipient truly owns the investment vehicle producing the income and whose capital is producing distributions or (a) the payor is trying to lull the recipient into inaction by concealing his or her intent to repudiate.

As to the **<u>second element</u>** of equitable estoppel, actual or constructive knowledge of the true facts, the complaint alleges that Joseph Rotwein signed the assignment document in exchange for $20,000, gave a copy to Albert Bell, delivered the original to Martin Bell to hold as a de facto escrowee, accounted to Albert Bell for 10% of every distribution (including $90,000 on one occasion from capital), and represented to Albert Bell that the only reason for not returning the original assignment was a desire to keep the syndicate's record title clean.   Joseph even volunteered to give the original document back to Albert Bell if he would sign a management agreement that guaranteed payment of liquidation proceeds to Albert Bell.   After Joseph's death, Defendant Rotwein has continued to pay the 10% to Albert Bell and to Bell as trustee, and even distributed to herself only 26.67% of the real estate – exactly the part of one third that had not been transferred to the Bells or to Sleepy Hollow and its predecessor.   All of these allegations reveal a detailed knowledge that the Bells did own, and the Rotweins did not own (except as nominees) the 10%.

Whenever Defendant Rotwein then decided to disregard the Bells' right to the liquidation proceeds, and failed to disclose that intention to the Bells, she knew or should have known that the conduct alleged was inconsistent with her new position and therefore misleading.   In its simplest terms, either the decision to steal Bell's interest in the building (however "derivative" it might be) was a recent one so that no time limit, laches or limitation, has run, or the conduct alleged was knowingly misleading and estopps Rotwein from asserting any time limitation.

As to the **third element**, the intention that another person act in reliance upon it is met by the same allegations. Both impliedly (by making payments for 50 years) and explicitly (by Joseph Rotwein stating in 1987 that he would continue to hold the document but protect Albert Bell's investment), with his offer to enter into a management agreement guaranteeing liquidation proceeds to Albert Bell, the Rotweins sought to have the Bells rely on them.

As to the **fourth** element, lack of knowledge and of the means of knowledge concerning the truth of the representation, neither Albert Bell nor Bell as trustee had any way to look inside the minds of Joseph Rotwein or Defendant Rotwein to see if, indeed, they harbored an intent to renege on the investment and deny the Bells the liquidation proceeds. Neither Rotwein ever disputed Albert Bell's right to 10% of every distribution from the syndicate to Joseph Rotwein and then to Defendant Rotwein. The only discussion even marginally relating to that subject was the 1987 exchange, in which Joseph Rotwein did not reveal any of what Defendant Rotwein now claims was his (and certainly now is her) true intent. Instead, he explained an entirely benign rationale for retaining the assignment document (which he admitted possessing) and promised to continue accounting to Albert Bell and even to put his obligation in writing by means of a management agreement. Therefore, where the public record and private representations (record title in Rotwein and equitable title in the Bells) are entirely consistent with the misleading conduct (accounting for and paying on the basis of equitable title in the Bells), there is no way by which Albert Bell or Bell as trustee could have known or learned that Defendant Rotwein or Joseph Rotwein ever intended to deny their equitable ownership.

The **fifth element**, reliance upon the misrepresentation, is shown by the actions of Albert Bell and Bell as trustee, who cashed the Rotweins' checks and accepted the financial statements for tax purposes without ever questioning that the long history of payments mean that their

41

investment was safe.   Related to this is the **sixth element**, change of position to the Bells'
prejudice, which is shown by the fact that neither Albert Bell nor Bell as trustee ever felt the
need to demand written evidence of the assignment or of the investment.  Bell must now must
defend against the opportunistic position taken by Rotwein without having the evidence he could
have gathered – including the testimony of Robert Mayer, Joseph Rotwein, Yolanda McInerny,
and others, as well as (if necessary) a suit to quiet title.   Moreover, Albert Bell could have
signed the proposed management agreement, guaranteeing him his share of the liquidation
proceeds, but did not do so in reliance on the (apparently) honorable conduct of the Rotweins.

This is a paradigm case for application of the principle of collateral estoppel.   The Bells
(Albert and Plaintiff) have relied for 50 years on the good faith of the Rotweins, whose conduct
was 100% contrary to the position now taken by Defendant Rotwein.   Under the circumstances
as alleged in the complaint, it would be an egregious injustice for any court to permit Defendant
Rotwein to steal a $3 million investment after lulling its owners into believing the investment
was safe, held in the name of friends who had always accounted for its capital and income, but
who from some point harbored a secret intention not to turn over the principal of that investment.

**IX.    Bell Has Alleged Causes Of Action For Spoliation and Conversion Based On The
Disappearance Of The Original Document Entrusted To Joseph Rotewein And
Received By Rotwein After His Death**

    **A.    Bell Has Alleged A Cause of Action for Spoliation**

Bell has alleged causes of action for spoliation and conversion.  In order to plead a cause
of action for spoliation, a plaintiff must allege (1) the existence of a potential civil action; (2) a
legal or contractual duty to preserve evidence which is relevant to that action; (3) destruction of
that evidence by the duty-bound defendant, (4) significant impairment in the ability to prove the
potential civil action, (5) a proximate relationship between the impairment of the underlying suit

and the unavailability of the destroyed evidence, (6) a significant possibility of success of the potential civil action if the evidence were available, and (7) damages adjusted for the estimated likelihood of success in the potential civil action. *See Mazloum v. District of Columbia Metropolitan Police Dept.*, 2007 WL 3257010, at \*27 (D.D.C. Nov. 6, 2007), citing *Holmes v. Amerex Rent-A-Car*, 180 F.3d 294, 297 (D.C.Cir. 1999).

Bell has alleged that Defendant Rotwein spoliated evidence of plaintiff's ownership of part of the 1500 Building and the Syndicate by either losing or destroying the original document evidencing that ownership. Compl. ¶¶ 179-80. Specifically, defendant Rotwein knew of the existence of a potential civil action whenever she, alone or with other record owners, formed the idea of depriving the Bell and Rotwein assignees of the proceeds of the sale of the 1500 Building. Compl. ¶ 96. Plaintiff also alleged that Francis Rotwein had a fiduciary duty to preserve the evidence of Bell's record title, an extension of the fiduciary duty that Joseph Rotwein had previously owed to preserve the record title. Compl. ¶ 55. Bell asserted that Defendant Rotwein destroyed the document or negligently failed to keep it safe for plaintiff. Compl. ¶180. As a result of the loss of access to the original document, plaintiff is put at a severe disadvantage in proving his 10% of one-third ownership (whether "derivative" or direct) of the 1500 Building and Syndicate. Why? Because the best evidence of Bell's interest is no longer available. Compl. ¶ 180-81. In fact, Defendant Rotwein, through her attorney, proclaimed that she would not acknowledge plaintiff's share in the Building, while also admitting for the first time that she did not have possession of the document. Compl. ¶ 98.

Rotwein argues that plaintiff has not stated a claim for spoliation because the unavailability of the original assignment is not relevant. See Motion to Dismiss, p. 24. To the contrary, it is wholly relevant. Plaintiff seeks a declaration from this Court of his interest in the

Rotwein one-third of the 1500 Building and the Syndicate. To the extent that the original document is no longer available, Bell's task of proving ownership is rendered more difficult. Indeed, Rotwein has stated, through counsel, that she would not recognize Bell's interest unless he could produce the very document she, as Joseph Rotwein's successor in interest, should have had in her possession, but now claims not to have.

**B.    Bell Has Alleged A Cause of Action for Conversion**

Conversion is any unlawful exercise of ownership, dominion or control over the personal property of another in denial or repudiation of his rights thereto. *Government Relations, Inc. v. Howe*, 2007 WL 201264, at *13 (D.D.C. Jan. 24, 2007), *citing Shea v. Fridley*, 123 A.2d 358, 361 (D.C. 1956).

Rotwein also claims that Bell has not adequately pled a cause of action for conversion because Bell never received the original assignment. *See Motion to Dismiss*, p. 24. That is irrelevant. The document belonged to Albert Bell, and was delivered to Martin Bell to hold. Indeed, the document was the personal property of Albert Bell. Delivery to Martin Bell as escrowee was delivery to Albert Bell. These facts are sufficient to make the document and the 10% Bell's property. That Joseph retrieved it after Martin's death does not change the fact that it belonged to Albert Bell and evidenced the interest that Joseph Rotwein acknowledged: Albert Bell was entitled to a one-thirtieth interest in the 1500 Building. Compl. ¶ 186-87. Defendant Rotwein continued to acknowledge Albert Bell's interest in the Syndicate by causing Bell, and then the Trust as his successor in interest, to be paid the correct pro rata share of Syndicate income or profits. Compl. ¶ 187. However, in February 2007, Defendant Rotwein, through her attorney von Salzen, communicated that she would cease to recognize Bell's interest in the 1500 Building, and further communicated that neither she nor the Bank of America ever had Bell's

44

original assignment document. Compl. ¶¶ 98, 190. After Joseph Rotwein's death, Defendant

Rotwein was the only individual who had access to and control over the assignment document

that Joseph Rotwein had admitted having in his custody. Compl. ¶ 190. Therefore, Defendant

Rotwein had control over Albert Bell's property, while denying its existence. Compl. ¶ 192.

Bell is left without his original assignment document and is thus exposed to the type of harm

Defendant Rotwein has already threatened, that she will no longer recognize his interest in the

1500 Building and Syndicate. Plaintiff has adequately pleaded spoliation and conversion, and

defendant's motion to dismiss should be denied.

## CONCLUSION

For the foregoing reasons, the motion to dismiss filed by Defendant Frances Rotwein

should be denied in all respects and she should be ordered to answer by a date certain.

Respectfully submitted,

**BULMAN, DUNIE, BURKE & FELD,
CHTD., attorneys for
ARTHUR BELL, as Trustee of the ALBERT
R. BELL LIVING TRUST**

By:  _____/s/ Alan S. Feld_____
　　　　　Alan S. Feld
　　　　　BULMAN, DUNIE, BURKE
　　　　　& FELD, CHTD.
　　　　　4610 Elm St.
　　　　　Bethesda, MD  20815
　　　　　(301) 656-1177

　　　　　Of Counsel (admitted pro hac vice)

　　　　　John H. Ward
　　　　　Autumn L. Sharp
　　　　　MUCH SHELIST DENENBERG
　　　　　AMENT & RUBENSTEIN, P.C.
　　　　　191 N. Wacker Dr., Suite 1800
　　　　　Chicago, IL  60606-1615
　　　　　(312) 521-2000

## **Certificate of Service**

I hereby certify that a true and correct copy of the foregoing **Plaintiff's Memorandum In Opposition to Defendant Rotwein's Motion to Dismiss** was served via first class mail, postage prepaid this _7th day of December, 2007, on all counsel of record:

Paul A. Kaplan, Esquire

Joseph P. Bowser, Esquire

Womble Carlyle Sandridge & Rice

1401 Eye Street, NW, 7th Flr.

Washington, D.C. 20005-2225

Counsel for Defendant Bank of America

Richard T. Rossier, Esquire

Alex Menendez, Esquire

McLeod Watkinson & Miller

One Massachusetts Ave., Ste. 800

Washington, D.C. 20001

Co-Counsel for Defendant Rotwein

Eric Von Salzen, Esquire

Hogan & Hartson, LLP

555 13th Street, N.W.

Washington, D.C. 20004

Co-Counsel for Defendant Rotwein

Arthur F. Konopka, Esquire

4530 Wisconsin Ave., N.W., Ste. 200

Washington, D.C. 20016

Co-Counsel for Defendant Rotwein

_____/s/ Alan S._____

Alan S. Feld  #172858

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ARTHUR BELL, as Trustee of the** | ) | |
| **Albert R. Bell Living Trust** | ) | **Case No. 1:07-CV-10578** |
| **Plaintiff,** | ) | **Judge: Huvelle, Ellen S.** |
| **v.** | ) | **Deck Type:  General Civil** |
| | ) | |
| **FRANCES ROTWEIN, and Bank of America** | ) | **JURY TRIAL DEMANDED** |
| **Defendants** | ) | |

### PLAINTIFF'S MEMORANDUM IN OPPOSITION
### TO DEFENDANT ROTWEIN'S MOTION TO DISMISS

Respectfully submitted,

**BULMAN, DUNIE, BURKE & FELD,**
**CHTD., attorneys for**
**ARTHUR BELL, as Trustee of the ALBERT**
**R. BELL LIVING TRUST**

By:   /s/ Alan S. Feld
        Alan S. Feld
        BULMAN, DUNIE, BURKE
        & FELD, CHTD.
        4610 Elm St.
        Bethesda, MD  20815
        (301) 656-1177

        Of Counsel (admitted pro hac vice)

        John H. Ward
        Autumn L. Sharp
        MUCH SHELIST DENENBERG
        AMENT & RUBENSTEIN, P.C.
        191 N. Wacker Dr., Suite 1800
        Chicago, IL  60606-1615
        (312) 521-2000

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ARTHUR BELL, as Trustee of the<br>Albert R. Bell Living Trust | ) | |
| | ) | Case No. 1:07-CV-10578 |
| Plaintiff, | ) | Judge: Huvelle, Ellen S. |
| v. | ) | Deck Type:  General Civil |
| | ) | |
| FRANCES ROTWEIN, and Bank of America | ) | |
| Defendants | ) | |

## ORDER

**UPON CONSIDERATION** of the Defendant Frances Rotwein's Motion to Dismiss, and

the opposition filed in response thereto, it is this _____ day of _____, 2007 by the United

States District Court for the District of Columbia

**ORDERED**, that Defendant Frances Rotwein's Motion to Dismiss the Complaint of Arthur

Bell, as Trustee of the Albert R. Bell Living Trust be, and it is hereby, DENIED.

_____
JUDGE Ellen S. Huvelle, United States District Court

# Exhibit A

## Unreported Cases

Westlaw.

Not Reported in F.Supp.                                                                Page 1

Not Reported in F.Supp., 1991 WL 496132 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Avianca, Inc. v. Corriea
D.D.C.,1991.
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.
AVIANCA, INC., et al., Plaintiffs,
v.
Mark F. CORRIEA, et al., Defendants.
Civ. A. No. 85-3277 (RCL).

May 31, 1991.

John Kazar Villa, John Alan Galbraith, Michael Shobe Sundermeyer, Williams & Connolly, Maureen Duignan, Robert Francis Reklaitis, Hopkins & Sutter, Washington DC, for defendant. No appearance for plaintiff.

MEMORANDUM OPINION
LAMBERTH, District Judge.
*1 This case comes before the court on defendant Andres J. Cornelissen's motion to dismiss the amended complaint. Defendant contends that the court lacks personal jurisdiction over him, that he has not been properly served, that the doctrine of *forum non conveniens* dictates a dismissal of this action, and that the amended complaint fails to state a claim upon which relief can be granted. After consideration of the defendant's motion, plaintiffs' opposition, defendant's reply, and the record herein, defendant's motion for dismissal is denied.

ANALYSIS

Andres J. Cornelissen, a citizen of Colombia, is the former president of plaintiff Avianca, S.A. Plaintiffs in this case seek damages against Cornelissen for breaching his fiduciary duties to Avianca and its subsidiaries and violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"). 18 U.S.C. § 1962. Cornelissen contends, however, that suit against him in this

court is improper on several procedural grounds. His first defense, and the one which this court will address first, is that this court lacks personal jurisdiction over him.

In order to defeat a defendant's motion for dismissal for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists. This threshold is not a high one and in considering the parties' arguments, the court must construe all disputed facts in favor of the plaintiffs.[FN1]

Plaintiffs, in this case, must demonstrate that the exercise of jurisdiction over Cornelissen satisfies both the D.C. long-arm statute and due process requirements. The D.C. statute at issue in this case provides, in relevant part:
(a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's-
(1) transacting any business in the District of Columbia.[FN2]

The D.C. Court of Appeals has held that the reach of § 13-423(a)(1) is coextensive with the limits of due process.[FN3] Accordingly, in order to establish jurisdiction over Cornelissen, plaintiffs must show that he "transacted business" in D.C. within the meaning of the statute, that their claims arose from the business transacted in the District,[FN4] and that exercising jurisdiction over Cornelissen would not offend " 'traditional notions of fair play and substantial justice.' "[FN5]

Plaintiffs allege that Cornelissen has engaged in several jurisdictionally meaningful contacts with this forum. For purposes of finding jurisdiction under (a)(1), the court need only consider defendant's contact with the forum through American Aerospace, Ltd. (AAL). In 1981, Cornelissen requested that Mark Corriea, a lawyer practicing in D.C., establish a Bermudian corporation for defendant's benefit.[FN6] The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 3 of 7

Not Reported in F.Supp.

Not Reported in F.Supp., 1991 WL 496132 (D.D.C.)
(Cite as: Not Reported in F.Supp.)

Page 2

corporation operated out of Corriea's law office and
arranged a leasing transaction in which two Boeing
707 aircraft were leased to Faucett Airlines, a
Peruvian company, with Avianca S.A. providing
aircraft maintenance. Plaintiffs allege that
Cornelissen was intimately involved in the Faucett
Airlines leasing deal, contributing "the knowledge,
the [negotiation of the] transaction, the ... assets.
In other words, the essence of the transaction." FN7

*2 In light of defendant's active role in the Faucett
leasing arrangement, the court finds that
Cornelissen's contacts with the jurisdiction through
the AAL transaction support the exercise of
personal jurisdiction over him for several reasons.
First, accepting plaintiffs' version of the facts, it
appears that Correia was acting pursuant to
Cornelissen's direction and therefore Correia's
actions in the forum with respect to the AAL
transaction may be imputed to Cornelissen.FN8
Second, the fact that AAL completed only one
transaction does not make it unfair to require
Cornelissen to defend himself in this court. The
D.C. Court of Appeals has held that since contacts
with a forum must be assessed "qualitatively rather
than quantitatively," FN9 even a single act within
the forum may support a finding of personal
jurisdiction.FN10 In this case, Cornelissen initiated
the business plan to form AAL, negotiated AAL's
Faucett leasing transaction, ordered that the deal be
effected, and profited from the transaction, knowing
all along that Correia's activities on behalf of the
corporation would be and were conducted in the
District.

Cornelissen's affirmative role in effecting the
AAL/Faucett leasing transaction supports this
court's finding that plaintiffs have made a prima
facie showing that defendant "purposefully
avail[ed] [him]self of the privilege of conducting
activities within the forum state, thus invoking the
benefits and protections of its laws" FN11 and
should "reasonably [have] anticipate[d] being haled
into court" FN12 in the District of Columbia.
Cornelissen's contacts with the forum were not "
random", "fortuitous", or "attenuated" FN13 or the
result of the "unilateral activity of another party or a
third person," FN14 but rather were of such a
quality that the assertion of personal jurisdiction

over him does not offend due process. Defendant's
motion to dismiss for lack of jurisdiction will be
denied.

*Service of Process*

On November 24, 1986, this court ordered that
plaintiffs serve defendant Cornelissen by sending
summons and complaints by certified mail or its
equivalent to nine addresses where defendant
receives mail or "otherwise has reason to contact."
FN15 Certified mail packages were dispatched but
no signed receipts were ever returned. Defendant
asserts that none of the packages actually reached
him and that accordingly, service was improper and
the complaint must be dismissed.

In the November 24, 1986 order, this court stated
that defendant Cornelissen "appears purposely to be
avoiding ... service." FN16 The fact that defendant
has not picked up any of the nine mailed packages
supports the court's earlier suspicion. Confronted
with a purposeful process evader, the court need not
require that a return receipt be filed in order to find
that service has been completed. As the court held
in *International Controls Corp. v. Vesco,*"where ...
mailing is coupled with leaving the summons and
complaint at a place where the defendant is
reasonably likely to learn of their contents, and
where the defendant has a long history of avoiding
process servers, due process is accorded without the
use of a return receipt." FN17 Here, defendant's
lawyers have been served with a copy of the
complaint. The court finds it difficult to believe
that Cornelissen's lawyers have never informed
defendant that plaintiffs have been attempting to
effect service. Additionally, Correia has stated
under oath that Cornelissen is aware of the fact that
he has been joined as a defendant in this action and
that defendant has stayed abreast of developments
in the lawsuit. Given these facts, the court finds
that the manner of service ordered on November 24,
1986 was reasonably calculated to give the
defendant actual notice of the lawsuit and that
defendant's due process rights have not been
violated.FN18

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1991 WL 496132 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

*Forum Non Conveniens*

**\*3** Defendant in his motion asks this court to refuse to exercise jurisdiction on the grounds of *forum non conveniens*. The doctrine of *forum non conveniens* allows a court to refuse to exercise its jurisdiction over a case because the chosen forum, while proper from a statutory viewpoint, [FN19] is inconvenient.

In considering challenges to plaintiffs' choice of forum, the court must balance both public and private interests. Examining the facts of this case, it does not appear to the court that Colombia, the alternative forum suggested by defendant, is a more convenient one than is D.C. for the adjudication of plaintiffs' claims. First, plaintiffs' causes of action arose from incidents which occurred in this forum. Several of Cornelissen's codefendants are D.C. residents and will be key witnesses during trial. Additionally, since most of the events at issue in this case occurred in this forum, the majority of documents relevant to this action are located here. Second, defendant suggests that Colombia would be a more convenient forum to try the claims against Cornelissen, but it is unclear that a Colombian court could exercise jurisdiction over Correia or the other defendants and resolve all the claims in a single action. Judicial economy considerations therefore strongly favor adjudication of the claims asserted against all defendants in one action and disfavor dismissal of the case against Cornelissen on the grounds of *forum non conveniens.* [FN20] Third, although adjudication of this case may require this court to interpret and apply foreign law, the need to apply foreign law is only one factor which the court may consider in its *forum non conveniens* analysis. Defendant has not demonstrated that foreign law will play a significant role in this case or that interpreting Colombian law will be especially difficult. Accordingly, the court gives little weight to this factor favoring dismissal.[FN21]

The court is not deaf to defendant Cornelissen's appeals that trial in this forum may require witnesses to travel from Colombia and translation of some documents. These concerns, while real, do not outweigh the substantial factors favoring trial in this forum. Accordingly, the court concludes that plaintiffs' choice of forum should not be disturbed.

*Dismissal for Failure to State a Claim*

A. Count II-Fraudulent Misrepresentation

Defendant Cornelissen makes a Rule 12(b)(6) motion requesting the court to dismiss count II for failure to state a claim. Count II of the amended complaint alleges that Cornelissen fraudulently misrepresented and concealed material information in violation of his fiduciary duties to plaintiffs. Defendant insists that this claim must be dismissed because plaintiffs have failed to satisfy Rule 9(b)'s particularity requirement.

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." [FN22] Defendant contends that plaintiffs have failed to meet this heightened pleading standard in a number of ways. First, defendant argues that plaintiffs' fraud allegation should be dismissed because the allegations made are based solely on "information and belief." Although it is true that a fraud complaint which rests solely on "information and belief" is generally inadequate to survive a motion to dismiss,[FN23] a review of plaintiffs' complaint shows that plaintiffs' allegations do not rest on mere speculation. In paragraph 57, plaintiffs list specific duties which defendant owed them. The list is not a generalized survey of broad fiduciary principles, but rather is a detailed recitation of specific incidents involving fraudulent misrepresentation in which Cornelissen participated. Although it is in paragraph 58 that plaintiffs actually allege, on information and belief, that defendant knowingly violated fiduciary duties by participating in the ventures described in paragraph 57, the court finds that considered together, paragraphs 57 and 58 adequately overcome the "information and belief" procedural hurdle and satisfy the particularity mandate of Rule 9(b).

**\*4** Defendant raises additional shortcomings in plaintiffs' misrepresentation allegations. For instance, defendant asserts that the pleadings are deficient because plaintiffs failed to allege that they relied on any of Cornelissen's purported misrepresentations to their detriment. The court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 4

Not Reported in F.Supp., 1991 WL 496132 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

notes, however, that Rule 9 should not be considered in isolation and should be construed in light of Rule 8 which calls for "short and plain statement[s]" FN24 of claims for relief.FN25 The court need not, therefore, dismiss for failure to allege with particularity a case such as this one in which a missing element of the fraud claim can easily be inferred from the complaint.FN26 In paragraph 56, plaintiffs assert "Defendant Cornelissen knew that plaintiffs relied upon his expertise and advice in the negotiation of aircraft leasing transactions" and in paragraph 57 describe some of the transactions in which Cornelissen purportedly made material misstatements. Considered together, such averments adequately allow this court to find that plaintiffs did rely on defendant and permit this court to excuse plaintiffs' minor failure to state the elements of its cause of actions with greater specificity.

The court finds equally unconvincing defendant's other rule 9(b) challenges to plaintiffs' count II pleadings. The court can assume from plaintiffs' allegations that defendant acted knowingly even when he made the purported misrepresentations even though plaintiffs do not provide specific facts establishing defendant's state of mind. Rule 9(b) states that " condition of mind of a person may be averred generally" FN27 and plaintiffs have done so.

Finally, contrary to defendant's contention, plaintiffs have met the specificity requirement that a fraud allegation refer to the time, place, and contents of the fraud.FN28 Plaintiffs in paragraphs 34-39 refer to the date of the Twin Otter transaction, the nature of the deal, and defendant's role in its effectuation.

In sum, after examination of plaintiff's amended complaint, the court finds that sufficient information has been provided to satisfy rule 9(b)'s particularity requirement with respect to count II. Defendant is adequately apprised of the nature of the claims made against him and has sufficient information to frame a responsive pleading.

## B. Count III-RICO

With respect to court III, defendant asserts that plaintiffs have failed to allege a "pattern of racketeering activity" necessary to maintain a RICO claim. Precisely what constitutes a "pattern" under the RICO statute does not lend itself to easy definition,FN29 but in its most recent effort to define the term, the Supreme Court stated that in addition to the minimum of two predicate acts, the plaintiff "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." FN30

Despite defendant's arguments to the contrary, plaintiffs have adequately pointed to related, continuing predicate acts which form a "pattern" under the RICO statute. Even if plaintiffs' RICO claim were premised solely on count II, the Twin Otter transaction,FN31 the court finds that the complaint adequately makes a RICO claim. Plaintiffs' allege that over the course of a two and one-half year period, defendant engaged in acts of mail fraud and wire fraud in furtherance of the Twin Otter scheme. These acts were "related" in that they were performed in furtherance of a common purpose-to create schemes which would accrue to defendant's profit at the expense of corporations to which defendant owed his loyalty-and were not merely "predicate acts extending over a few weeks or months." FN32

*5 The court agrees with defendant that plaintiff's complaint fails to provide the precise dates and times of the purported mail and wire fraud incidents, but in a case such as this, in which the fact that the transactions occurred is not at issue, the court will not dismiss the claim for lack of specificity, but will order plaintiffs to amend their complaint to conform with the evidence already adduced pursuant to Rule 15.

For the reasons set forth above, the court this date shall enter the accompanying order denying the defendant's motion for dismissal.

FN1. *See Reuber v. United States,* 750 F.2d 1039, 1052 (D.C.Cir.1984).

FN2.  D.C.Code   Ann.   §   13-423(a)(1)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 5

Not Reported in F.Supp., 1991 WL 496132 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

(1989).

FN3. *See Envtl. Research Int'l Inc. v. Lockwood Greene Eng'rs Inc.,* 355 A.2d 808, 810-11 (D.C.1976).

FN4. *See*D.C.Code Ann. § 13-423(b) (1989) (stating that "only a claim for relief arising from acts enumerated in this section may be asserted against him.").

FN5. *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945), quoting *Milliken v. Meyer,* 311 U.S. 457, 463 (1940).

FN6. Cornelissen supplied the initial capital and was the sole beneficial owner of the corporation. *See* Correia dep. at 65; Cornelissen dep. at 62.

FN7. Corriea dep. at 524.

FN8. *Cf. Rose v. Silver,* 394 A.2d 1368 (D.C.1978) (where an attorney was hired by a foreign corporation and its president and sent to Washington, D.C. to establish an office and negotiate with the FDA, the corporation and its president were transacting business in the district through an agent and had established the minimum contacts necessary for personal jurisdiction over them consistent with due process.).

FN9. *Mouzavires v. Baxter,* 434 A.2d 988, 995 (D.C.1981).

FN10. *See Envtl. Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.,* 355 A.2d 808, 810 (D.C.1976) ("Even a small amount of injurisdiction business activity is generally enough to permit the conclusion that a nonresident defendant has transacted business here."); *Mouzavires,* 434 A.2d at 992 ("[A] single act may be sufficient to constitute transacting business.").

FN11. *Hanson v. Denckla,* 357 U.S. 235, 253 (1958).

FN12. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980).

FN13. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985).

FN14. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 417 (1984).

FN15. Order of November 24, 1986. The court is authorized, under Federal Rules of Civil Procedure 4(i)(1)(E), to fashion alternative methods of service so long as the method is "reasonably calculated, under all the circumstances, to apprise the interested part[y] of the pendency of the action and afford [him] an opportunity to present [his] objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950).

FN16. Order of November 24, 1986.

FN17. *Int'l Controls Corp. v. Vesco,* 593 F.2d 166, 175 n. 4 (2d Cir.1979).

FN18. *See Frank Keevan & Son Inc. v. Callier Steel Pipe & Tube, Inc.,* 107 F.R.D. 665, 671 (S.D.Fla.1985) ("[C]ourts have held that actual notice of a complaint, coupled with good faith attempted service, may be sufficient to confer personal jurisdiction, especially when a defendant has acted to evade service of process.").

FN19. Venue is proper in this court because the claim arose here. *See*28 U.S.C. § 1391(b).

FN20. Judicial economy is promoted in a number of ways by trying this case as a single action in Washington, D.C. First, were this case to be brought in Columbia, testimony and depositions already taken in English would have to be translated into Spanish. *See Friends for All Children Inc. v. Lockheed Aircraft Corp.,* 717 F.2d 602, 608 (D.C.Cir.1983). Second, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                              Page 6

Not Reported in F.Supp., 1991 WL 496132 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

court takes note of the fact that a significant amount of effort has already been expended in comprehending and managing this case. Over 400 documents, comprising thousands of pages, have been filed in this case. If the case against Cornelissen were to be dismissed at this stage, another court would have to expend a substantial amount of labor in order to familiarize itself with the relevant facts and law involved in this lawsuit.

FN21. *See Lehman v. Humphrey Cayman, Ltd.,* 713 F.2d 339, 345 (8th Cir.1983) (holding that "[f]ederal courts are quite capable of applying foreign law when required to do so, and a district court's application of foreign law is a factual matter reviewable on appeal.").

FN22. Fed.R.Civ.P. 9(b).

FN23. *See Segal v. Gordon,* 467 F.2d 602, 608 (2d. Cir.1972).

FN24. Fed.R.Civ.P. 8(a).

FN25. *See* 2A J. Moore *Federal Practice* at § 9.03[2] at 9-38-9-39 (1990).

FN26. *See Democratic National Committee v. McCord,* 416 F.Supp. 505, 508 (D.D.C.1976) (holding that while reliance is an essential element of a fraudulent misrepresentation claim, it need not be specially pleaded if it can readily be gathered to exist from the allegations in the complaint.).

FN27. Fed.R.Civ.P. 9(b).

FN28. *See United States ex rel. Joseph v. Cannon,* 642 F.2d 1373, 1385 (D.C.Cir.1981), *cert. denied,*455 U.S. 999 (1982).

FN29. *See H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 243 (1989) ("The limits of the relationship and continuity

concepts that combine to define a RICO pattern, and the precise methods by which relatedness and continuity or its threat may be proved, cannot be fixed in advance with such clarity that it will always be apparent whether in a particular case a 'pattern of racketeering activity' exists.").

FN30. *H.J. Inc.,* 492 U.S. at 239 (emphasis in the original).

FN31. Plaintiffs argue that its RICO claim incorporates both counts I (breach of fiduciary duty) and count II (fraudulent misrepresentation-the Twin Otter transaction). Since the Supreme Court held in *H.J. Inc.* that the term "pattern" " might encompass multiple predicates within a single scheme,"492 U.S. at 237, the court need not address defendant's contention that breach of fiduciary duty is not a predicate act on which plaintiffs can base a RICO claim.

FN32. *H.J. Inc.,* 492 U.S. at 242.
D.D.C.,1991.
Avianca, Inc. v. Corriea
Not Reported in F.Supp., 1991 WL 496132 (D.D.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 1995 US APP LEXIS 19995

**James K. Jeanblanc, Appellant v. The Oliver Carr Company, Appellee**

**No. 94-7118**

**UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

**1995 U.S. App. LEXIS 19995**

**June 21, 1995, FILED**

**NOTICE:**    [*1] RULES OF THE DISTRICT OF COLUMBIA CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:**    Reported in Table Case Format at: 62 F.3d 424, 1995 U.S. App. LEXIS 41148.

**PRIOR HISTORY:**    Appeal from the United States District Court for the District of Columbia. (No. 91cv00128).

**DISPOSITION:**    Affirmed.

**JUDGES:**    Before: WALD, SILBERMAN and SENTELLE, Circuit Judges.

**OPINION**

**JUDGMENT**

This appeal was considered on the record from the United States District Court for the District of Columbia, on the briefs filed by the parties, and on oral arguments presented May 12, 1995. The issues were accorded full consideration by the Court and occasion no need for a published opinion. See D.C. Cir. Rule 36(b). For the reasons stated in the accompanying memorandum, it is

**ORDERED AND ADJUDGED** that the judgment of the District Court be affirmed on all counts in accordance with the accompanying memorandum.

The Clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. See D.C. Cir. Rule 41.

Per Curiam

**MEMORANDUM**

Appellant James Jeanblanc appeals the entry of summary judgment against him in his action against Oliver Carr [*2] Co. ("Carr") in this action arising out of a real estate partnership as well as the dismissal of that part of his claim relating to his father's interest in the partnership as a sanction for destruction of documents. We have considered Jeanblanc's arguments in full, but address here only those arguments which we believe merit separate consideration. We affirm the judgment of the district court on all counts.

**I. BACKGROUND**

Appellant James K. Jeanblanc and his father Lindsey Jeanblanc were limited partners in the Square 224 Partnership ("Square 224"), a limited partnership in which appellee Oliver Carr Company ("Carr") was the lone general partner. In 1979, the Jeanblancs each invested $125,000 in the partnership, which was formed to acquire and hold the property located in Square 224 of the District of Columbia, and then later contribute the property to a development venture which had yet to be formed. To compensate Carr Co. for its efforts in assembling the Development Property, the agreement provided Carr Co. with a credit to its "capital account in the development venture" (the "Carr Land Credit") equal to the difference between Carr's acquisition cost of the development [*3] property and $ 20/sq.ft. It also provided Carr a fee for the services it would perform for the development venture, stating that 80% of this fee could be reinvested as an additional contribution to Carr's capital account in the development venture (the "Carr Development Fee"). The agreement contemplated that such reinvestments would result in the "appropriate adjustment" of all partners' partnership interests. Finally, the agreement provided that any partner receiving an offer to buy its interest must inform the other partners of the offer. The other partners would then have a right of first refusal, with Carr getting

priority to purchase. Excepted from this provision were transfers to a subsidiary of a partner and transfers "without consideration."

At a May 1980 meeting of the partners, Oliver Carr described a transaction to develop the property being negotiated with the Equitable Life Assurance Society ("Equitable"), in which Equitable would purchase a 25% interest in the new Development Venture for $ 6 million and Square 224 would own the remaining 75% (in exchange for the property held by the partnership). The property would be developed in two phases. At the meeting, Carr distributed [*4] a detailed handout explaining the terms of the Equitable deal, stating that: (1) Carr would recognize its Land Credit and Development Fee in Square 224, rather than in the Development Venture; (2) the Carr Land Credit would be recognized before recognition of a "general land credit" to be credited to all partners; (3) a closed alley that bordered the development property ("the alley") was treated as part of the land acquired by Carr Co. for purposes of calculating the Carr Land Credit; and (4) no land acquisition costs would be recognized for the alley. The handout indicated that, as a result of Carr Co.'s recognition of the credits, the Jeanblancs' individual shares would decrease from 2.49% to 1.81%.

In December 1980, Jeanblanc, his father and the other limited partners gave Carr Co. written authority to form the Development Venture with Equitable on the terms discussed at the May meeting. In February 1981, the day after executing the agreement with Equitable, Carr Co. provided the limited partners with a letter and enclosure further detailing the Venture's terms. The letter confirmed the effects of the Carr Land Credit, the Carr Development Fee, and the General Land Credit.

In [*5] 1984, Phase Two of the Development Venture began with Equitable providing a second level of financing and the partnership contributing the Phase II lots to the venture. Carr informed Jeanblanc that a second portion of the Land Credit and Development Fee would be applied in Phase II, and Jeanblanc complained that he thought that the "percentage would be the same." Although no Phase II credits were taken until 1986, Carr told Jeanblanc in 1985 that his interest would be diminished by the Phase II credits. In February 1986, Carr mailed Jeanblanc a spreadsheet that illustrated that his interest would decrease from 1.58% to 1.405% as a result of recognition of the Carr Land Credit and Development Fee. Again, in November, 1987, Carr Co. provided Jeanblanc with an elaborate step-by-step breakdown of the calculations.

On January 29, 1990, Carr Co. informed the limited partners that LaSalle Advisors Limited ("LaSalle") had offered to purchase Equitable's 25% interest in the De-velopment Venture, and the interests of any individual partners in Square 224. Both Jeanblancs informed Carr that they wished to cash out. Each received $ 1.11 million for the sale of their respective 1.405% interests.

[*6] On December 17, 1990, Jeanblanc brought suit in the Eastern District of Virginia on his own behalf and derivatively for the other limited partners. The court dismissed Jeanblanc's derivative claims and transferred the remaining counts to D.C. District Court. On January 28, 1991, Lindsey Jeanblanc assigned his claim against Carr to his son, James. Shortly thereafter, Lindsey Jeanblanc destroyed all of his documents pertaining to Square 224.

On February 5, 1991, Jeanblanc filed a three-count amended complaint against Carr in district court, alleging that Carr Co. breached the partnership agreement and its fiduciary duties. Jeanblanc contended that he should have had 2.4907% of Square 224 when his interest was sold in 1990. In Count One, he alleged that Carr Co. de-frauded him (and his father) in at least four ways: (1) by recognizing the Land Credit and Development Fee in the partnership and not in the development venture; (2) by recognizing the Land Credit before recognizing the General Land Credit; (3) by including the alley as part of the development property; and (4) by recognizing zero acquisition costs associated with the alley. Jeanblanc prayed for damages and an accounting. [*7] Additionally, he challenged various assignments of interests from Carr Co. to Carr Co. employees. Counts Two repeated the allegations and charged that Carr Co. breached its fiduciary duties in failing to sell all of Jeanblanc's interest. Count Three charged that Carr Co. failed to account for and distribute all of the proceeds of the May 1990 sale.

On March 3, 1992, Carr moved to dismiss the entire case as a sanction for destruction of documents. The district court granted Carr's motion in part, finding that Lindsey Jeanblanc destroyed every document in his control pertaining to the transactions at a time when he knew that a lawsuit was pending. As a sanction, the court dismissed the portion of the case arising from Lindsey Jeanblanc's interest.

On September 14, 1992, the parties filed cross motions for summary judgment. The court partially granted Carr's motion and denied Jeanblanc's motion. Although it had previously held in response to a 12(b) motion that counts one and two were equitable in nature and thus subject to laches rather than the statute of limitations, the Court revisited the issue on summary judgment. It concluded that the "overwhelming evidence of Jeanblanc's knowledge [*8] and his failure to act promptly, persuades the court that justice would not be served by denial of the defendant's statute of limitations defense."

Stating that "both the discovery of additional and substantial evidence and the prevention of manifest injustice require reexamination of the Court's earlier rulings," the court found that a three-year statute of limitations applied. The court thus held that counts one and two of the complaint were time-barred. Alternatively, the court held that the assignments to Carr Co. employees were not "personal assignments" barred by the agreement, but rather were assignments to joint ventures that were "subsidiaries" of Carr, and thus allowable.

After settlement of the remaining claim and subsequent entry of judgment, Jeanblanc appealed.

## II. ANALYSIS

### I. *Laches and the Statute of Limitations.*

In its disposition of the case below, the district court held that Jeanblanc's claims were barred by the three-year statute of limitations applicable to contract actions in the District of Columbia. *See* D.C. Code Ann. § 12-301(7) (1994). Appellant claims that the district court erroneously applied the three-year statute instead of a twelve-year [*9] statute of limitations accorded documents under seal. *See id.* § 12-301(6). Relying upon the proposition that, under District of Columbia law, a party who signs an instrument to which another has affixed his seal is presumed to adopt the seal, *see McNulty v. Medical Service of D.C., Inc.,* 176 A.2d 783, 784 (D.C. 1962), appellant contends that the twelve-year statute applies here because the partnership agreement governing Square 224 was signed under seal by all of the limited partners.

Assuming *arguendo* the correctness of appellant's proposition that the twelve-year statute of limitations applies, we nonetheless conclude that appellant's claim is barred under the doctrine of laches. Although appellant's claims may be within the twelve-year period authorized by statute, the statute of limitations provides only the "outside limit beyond which [the legislature] has determined claims are simply too stale to be litigated." *Detweiler v. Pena,* 309 U.S. App. D.C. 16, 38 F.3d 591, 595 (D.C. Cir. 1994) (quoting, with approval, *Deering v. United States,* 223 Ct. Cl. 342, 620 F.2d 242, 245 (Ct. Cl. 1980)). Even where the twelve-year statute mandated for documents under seal [*10] applies, a claim may be otherwise barred as untimely by the equitable doctrine of laches. *See Amidon v. Amidon,* 280 A.2d 82, 84 (D.C. 1971) (applying laches in case involving separation agreement where only seven of the twelve years allowed by statute had passed).

In order to apply laches to bar a claim as untimely, a defendant must show that the plaintiff has unreasonably delayed in asserting a claim and that there was "undue prejudice" to the defendant as a result of the delay. *American Univ. Park Citizens Ass'n v. Burka,* 400 A.2d 737, 740 (D.C. 1979).

We believe that Jeanblanc's delay until 1990 in filing suit was unreasonable and inexcusable. The record reflects that Carr provided sufficient information regarding the disputed transactions at a May 1980 meeting of the partners to put Jeanblanc on notice of all relevant facts. Again, after executing the agreement with Equitable Life Assurance Society, in February 1981, Carr provided detailed handouts indicating how Jeanblanc's shares would decrease in percentage terms. Additionally, Carr informed Jeanblanc of the challenged transfers to James Clark in 1982. Our review of the record reveals that appellants had sufficient [*11] information at that time to challenge Carr's calculation of ownership interests. Jeanblanc's rationale for not challenging these transactions earlier -- that appellees had misled them into believing that the transactions conformed to the partnership agreement -- is unavailing because Jeanblanc had a copy of that agreement to refute that claim. Thus, with respect to count one and the claim that Carr improperly transferred an interest to James Clark, we conclude that Jeanblanc's delay of nearly eight years in filing suit was unreasonable.

Next, we agree with Carr that Jeanblanc's delay in filing suit unduly prejudiced Carr. In the normal course of its business, Carr had destroyed certain business documents -- including invoices, bank statements, cancelled checks, etc. -- with which it could have been able to defend itself had the claim been brought in a timely manner. Among the inequities that the doctrine of laches protects against is the loss of pertinent evidence. *See NAACP v. NAACP Legal Defense & Educ. Fund, Inc.,* 243 U.S. App. D.C. 313, 753 F.2d 131, 137 (D.C. Cir.), *cert. denied,* 472 U.S. 1021, 87 L. Ed. 2d 623, 105 S. Ct. 3489 (1985). Appellant claims that undue prejudice [*12] cannot arise from the destruction of one's own documents. Although we agree that under certain circumstances -- such as a potential defendant having knowledge of pending claims -- destruction of evidence will clearly not support a finding of prejudice, *see EEOC v. Massey-Ferguson, Inc.,* 622 F.2d 271, 280 (7th Cir. 1980); *Bernard v. Gulf Oil Co.,* 596 F.2d 1249, 1257 (5th Cir. 1979), we find that the circumstances here present a compelling case of undue prejudice. Appellee's destruction of documents was not willful; rather, the documents were destroyed in the ordinary course of business. Because the documents themselves were not documents under seal, it was reasonable for appellee to destroy them after the lapse of the normal three-year period of limitations. *See* D.C. Code Ann. § 12-301(7).

We thus conclude that appellee has met its burden of demonstrating unreasonable delay and undue prejudice

and hold that both count one and appellant's claim regarding transfers of interests to James Clark are thus barred by the equitable doctrine of laches.

### B. Other Claims.

We agree with the district court that appellant's separate claims regarding sales of interests to employees [*13] and the amount paid per percentage point of interest in the partnership are meritless.

The partnership agreement excepted from the right of first refusal any transfers without consideration and any assignments to subsidiaries. The challenged transfers meet both criteria. The assignments to Carr employees were in recognition of past services, as indicated by the language in the assignment documents, "In recognition of [the employee's] efforts, ability and diligence exhibited in the course of his employment, the Carr Company has assigned to him a portion of said participatory interest." As we have noted, "past consideration is no consideration." *Murray v. Lichtman,* 119 U.S. App. D.C. 250, 339 F.2d 749, 752 n. 5 (D.C. Cir. 1964). Thus, these assignments are excepted from the agreement as transfers without consideration. Additionally, because the transaction regarding each employee is, at least in form, a transfer to a subsidiary, the employee transfers are excepted. The district court thus correctly dismissed these claims.

Finally, the district court correctly noted that the documents submitted by both parties indicated that each partner cashing out of the partnership would receive [*14] $ 789,000 from the sale of each percentage point in the transaction. Appellant's claim here is utterly baseless and thus properly rejected.

### C. Sanctions.

The record demonstrates that Lindsey Jeanblanc's destruction of documents was knowing and willful, unlike that of the appellee which was done in the normal course of business. In cases involving the "willful, systematic, and extensive destruction . . . of documents," we have clearly stated that a district court may dismiss an entire case as a sanction. *See Synanon Church v. United States,* 261 U.S. App. D.C. 13, 820 F.2d 421, 427 (D.C. Cir. 1987). Dismissal is an option at the disposal of a district court in exercising its "inherent power . . . to levy sanctions in response to abusive litigation practices." *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 765, 65 L. Ed. 2d 488, 100 S. Ct. 2455 (1980). The sanction was particularly appropriate here, where the documents were destroyed willfully and the opponent is in no position to present evidence of their content. *See Synanon Church,* 820 F.2d at 428 ("The occurrence of a cover-up raises a presumption that disclosure of the materials would be damaging.").

Accordingly, [*15] the decision of the district court is affirmed.



Not Reported in F.Supp.                                                              Page 1

Not Reported in F.Supp., 1992 WL 88004 (D.D.C.), Fed. Sec. L. Rep. P 97,310
**(Cite as: Not Reported in F.Supp.)**

▷ Shields v. Washington Bancorporation
D.D.C.,1992.

United States District Court, District of Columbia.
Rodney B. SHIELDS, Plaintiff,
v.
WASHINGTON BANCORPORATION, et al.,
Defendants.
**Civ. A. No. 90-1101(RCL).**

April 7, 1992.

### MEMORANDUM OPINION

LAMBERTH, District Judge.

*1 This case comes before the court on the motions of the individual defendants to dismiss the complaint filed by the original plaintiff, Rodney B. Shields. Plaintiff Shields had originally sought to represent a class of plaintiffs consisting of the shareholders of the Washington Bancorporation (" WBC"), the holding company which owned the National Bank of Washington ("NBW"), whose failure has generated enormous amounts of litigation in the District of Columbia. The court denied plaintiff's motion for class certification on the ground that plaintiff's small stake in the holding company and his past relationship with the attorneys who had represented him in prior class actions and again in this action would make him an inadequate representative of the class. *See* Oct. 10, 1991, Memorandum Opinion at 5. Shortly thereafter, James D. Moffett filed a motion to intervene as the class representative to perpetuate the class action. Defendants have opposed the motion to permit intervention and further seek dismissal of Moffett's claims, if the court grants his motion to intervene. Thus the court must first determine whether Moffett's amended complaint, which is substantially identical to the original plaintiff's amended complaint, is properly before the court and then decide whether the defendants' dispositive motions have merit.

### I. Moffett's Motion to Intervene as Class Plaintiff

By a memorandum opinion and order filed October 10, 1991, the court denied Shields' motion for class certification on the very narrow ground that Shields would not be an "adequate" class representative as required by Rule 23. The court has broad discretion in certifying a class representative. The small stake which Mr. Shields had in WBC in combination with his relationship with his attorneys/co-counsel mitigated against certifying him as a class representative. If he were to share in any attorney fee award as he has in other cases, particularly in a class action where the attorney may very well profit more than any one involved, including successful plaintiffs, the possibility of a conflict of interest arises which might unfairly prejudice the rights of class members. In that opinion, the court implied that this case would be most appropriately resolved as a class action; to this date, defendants have raised no argument to reject this contention.

Moffett moved to intervene as the class plaintiff on November 11, 1991, and amended his motion on November 22, 1991. At the time of these motions, he stated in his accompanying memorandum that the Supreme Court's holding in *American Pipe & Constr. Co. v. Utah,* 414 U.S. 538 (1974), demonstrated that the statute of limitations with respect to his claims was tolled during the pendency of Shields' motion for class certification. *See* Moffett's Am.Mot.Intervene at ¶ 5. Only if the statute were tolled would his claims be timely.

The Supreme Court in *American Pipe* and subsequently in *Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345 (1983), held that tolling the statute of limitations pending the resolution of class certification was necessary in order to fulfill the policies of Rule 23 of the Federal Rules of Civil Procedure. Absent tolling, prospective plaintiffs and putative class members would be forced to intervene or to bring their own individual suits in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1992 WL 88004 (D.D.C.), Fed. Sec. L. Rep. P 97,310
**(Cite as: Not Reported in F.Supp.)**

order to protect their rights. The judicial economy which a class action is supposed to foster would be lost unless the statute of limitations is tolled. In addition, defendants' rights would not be prejudiced because they would be on notice of the type and approximate number of claims which they might be facing within the period defined by the statute of limitations. Justice Powell, while concurring in *Crown, Cork,* noted that this rule was a "generous one, inviting abuse." *Crown, Cork,* 462 U.S. at 354 (Powell, J., concurring).

*2 *American Pipe* involved an attempt by a plaintiff to intervene as an individual plaintiff in a suit which the district court had refused to certify as a class action. *Crown, Cork* involved a subsequent individual suit brought by a putative class member in the rejected class action. Intervenor here seeks to perpetuate the class action itself by substituting himself as the named plaintiff. As such the case is in a slightly different posture than those which the Supreme Court has decided. Defendants argue that *American Pipe* and *Crown, Cork* do not permit a plaintiff to bring a new *class action* or to intervene as a *class plaintiff;* rather, argue defendants, the only action which Moffett can bring that would benefit from equitable tolling would be an *individual* action (or he could seek to intervene in the pending action as an individual plaintiff). Defendants focus on the specific language of the two Supreme Court cases, which, on their face, deal only with individual actions. Defendants also cite cases from several circuits that suggest that the statute of limitations is not tolled by a motion for class certification as to subsequent class actions. *See, e.g., Korwek v. Hunt,* 827 F.2d 874 (2d Cir.1987); *Salazar-Calderon v. Presidio Valley Farmers Ass'n,* 765 F.2d 1334 (5th Cir.1985), *cert. denied,*475 U.S. 1035 (1986); *Burns v. Ersek,* 591 F.Supp. 837 (D.Minn.1984).

While this court does not disagree with the holdings in these other cases, they nevertheless do not appropriately apply to the situation at bar. In most of these cases, the first court to rule on certification had found that a class action was not an appropriate mechanism for resolving the plaintiffs' claims, generally because the class failed to satisfy the typicality or numerosity requirements of Rule 23.

*See, e.g., Korwek,* 827 F.2d at 879 (stating that the prior court had found the class action " unmanageable"); *Salazar-Calderon,* 765 F.2d at 1350 (citing the district court which had denied certification because common questions of fact did not predominate). Plaintiffs in these cases (sometimes the same plaintiffs who had originally been denied class certification) were attempting to obtain class certification for the exact same class that had previously been deemed inappropriate for class action treatment. In a sense, these plaintiffs were filing new suits in order to seek reconsideration of the prior denial of class certification. In this posture, plaintiffs likely do not deserve the benefits of equitable tolling.

This case presents an altogether different situation. Plaintiff Shields brought a suit which at this time appears appropriate for resolution through a class action suit. To all eyes, including those of the putative class members such as Moffett, Shields' complaint should have served to protect the interests of the class, both individually and as a class. The court, however, concerned over a possible conflict of interest, found Mr. Shields to be an inadequate class representative. Unlike the original court in *Korwek,* this court has not made a " definitive determination of the inappropriateness of class certification." *Korwek,* 827 F.2d at 879. The court, at this time, still believes that, if this suit goes forward, class action treatment would be the most efficient manner of resolution for all parties concerned.

*3 The relevant considerations discussed by the Supreme Court in *American Pipe* and *Crown, Cork* all point to permitting intervention. "Flexibility, notice, and efficiency are the watchwords of these opinions." *Korwek,* 827 F.2d at 879. Defendants are fully apprised of the class claims and have been aware of the approximate number of claims which they may be forced to defend. *See American Pipe,* 414 U.S. at 555 (permitting tolling where defendant has "the essential information necessary to determine both the subject matter and size of the prospective litigation"). In addition, defendants cannot be said to have relied on this court's refusal to certify Shields as class representative; the intervenor did not sit on his rights, but rather,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 3

Not Reported in F.Supp., 1992 WL 88004 (D.D.C.), Fed. Sec. L. Rep. P 97,310
**(Cite as: Not Reported in F.Supp.)**

entered the litigation promptly upon recognition that his rights would not be protected by the original plaintiff's suit. Further, judicial economy will be preserved if this action continues as a class action; denial of Moffett's motion will trigger a slew of interventions or individual suits. As for future cases, any other result here would create incentives for plaintiffs to intervene at the early stages of a future litigation in order to insure that a case appropriate for class status will actually obtain certification. Thus, permitting intervention in this case does not vitiate the purposes underlying statutes of limitations, but does further the policies behind class actions.

The Supreme Court's holding in *United Airlines, Inc. v. McDonald,* 432 U.S. 385 (1977) appears to support this result. In that case, the district court denied class certification and the case proceeded for several years until it was settled. After the settlement, a putative member of the class attempted to intervene in order to appeal the denial of class certification. Under that circuit's law, interlocutory appeals of denials of class certification were not permitted, so the intervenor could not have achieved anything by entering the suit at an earlier time. The Supreme Court held that intervention was permissible and that the statute of limitations was tolled through the entire lawsuit, so that a new named plaintiff could appeal the prior denial of class certification. The Court focused on the actions of the intervenor: "as soon as it became clear to the respondent that the interests of the unnamed class members would no longer be protected by the named class representative, she promptly moved to intervene to protect those interests.... The critical inquiry in every such [post-judgment intervention] case is whether in view of all the circumstances the intervenor acted promptly after the entry of final judgment." *United Airlines,* 432 U.S. at 394-6. The equities favor the intervenor in this case far more than in *United Airlines,* where the intervenor sought review of the class certification issue several years later.[FN1]

Finally, the court notes that, although this circuit has never considered this issue directly, the court of appeals has indicated that *American Pipe's* equitable tolling rule should be applied broadly. In

*McCarthy v. Kleindienst,* 562 F.2d 1269 (D.C.Cir.1977), the court of appeals stated that "[t]he policy considerations outlined in *American Pipe* call for a broad reading of that decision." *Id.* at 1273. Intervenors should not be forced to themselves determine the viability of a particular class action (or the adequacy of the representative) because such calculations are based on "subtle factors" which are not easy for potential intervenors to evaluate. *Id.* at 1272-73. The shareholders whom Shields attempted to represent should not be penalized by the court's concerns about a conflict of interest, nor should the court be penalized by being forced to take on a multitude of individual suits, particularly when, as here, the defendants are not prejudiced. The court emphasizes that its holding is very narrow and based on the particular facts and history of this case. Moffett's motion to intervene shall be granted and the court must now consider whether the Moffett and Shields complaints should be dismissed.

### III. The Sufficiency of Plaintiffs' Allegations of Fraud

#### A. Rule 9(b) and the Requirement of Particularity

**\*4** Defendants moved for the court to dismiss plaintiff Shields' claims for failing to satisfy the requirements of Rule 9(b) which states:

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally. F.R.C.P. Rule 9(b).

Because the Moffett amended complaint is substantially similar to the Shields amended complaint, both Moffett's counsel (who are also Shields' counsel) and the defendants have simply adopted the arguments made in the memoranda filed on the motions to dismiss the Shields complaint. In discussing defendants' motions to dismiss, the court will most often refer to the Shields complaint, though its conclusions apply to both complaints.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1992 WL 88004 (D.D.C.), Fed. Sec. L. Rep. P 97,310
**(Cite as: Not Reported in F.Supp.)**

Rule 9(b) does not place a heavy burden on plaintiffs. After all, Rule 9 must be read in conjunction with the relatively liberal pleading requirements of Rule 8. *See Shahmirzadi v. Smith Barney, Harris Upham & Co.,* 636 F.Supp. 49, 53 (D.D.C.1985). Nonetheless, plaintiffs must specify the fraudulent conduct which is the subject of the suit. The purposes of 9(b) are threefold: to provide fair notice to defendants of the claims against them, to prevent attacks on defendants' reputations when the claim for fraud is unsubstantiated, and to prevent plaintiffs from bringing strike suits purely for their settlement value. *See Stern v. Leucadia Nat. Corp.,* 844 F.2d 997, 1003 (2d Cir.1988), *cert. denied,* 488 U.S. 852. To achieve these purposes, plaintiffs must allege the time, place, manner, contents, and speaker of the allegedly fraudulent statements, in addition to a description of how the plaintiff was misled. *See Shahmirzadi,* 636 F.Supp. at 53. To satisfy the particularity requirement, a plaintiff must also give specific information "as to the respect in which plaintiff contends the statements were fraudulent." *Cosmas v. Hassett,* 886 F.2d 8 (2d Cir.1989); *Goldman v. Belden,* 754 F.2d 1059, 1069-70 (2d Cir.1985). Because, however, plaintiffs often cannot know information that is peculiarly in the possession of the defendants, plaintiffs need only provide a statement of facts upon which the plaintiffs' allegations are based. *See In re Craftmatic Sec. Lit.,* 890 F.2d 628, 645 (3d Cir.1989); *Stern,* 844 F.2d at 1004. If a plaintiff is alleging fraudulent omissions of material facts, plaintiff must, to some extent, identify the information which should have been disclosed. *See Billet v. Storage Technology Corp.,* 72 F.R.D. 583, 586 (S.D.N.Y.1976).

Although the burden is not heavy, plaintiffs cannot plead "fraud by hindsight." *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978); *DiLeo v. Ernst & Young,* 901 F.2d 624, 628 (7th Cir.1990), *cert. denied,* 111 S.Ct. 347. Plaintiff cannot simply allege that a business or an investment has failed and then suggest that some fraud must have occurred because the failure was not foreseen. Such general pleading does not sufficiently particularize the alleged fraud because it is too conclusory; it does not explain to defendants what

statements or omissions are deemed to be fraudulent and how they are fraudulent nor does it reveal the factual basis for the allegations of fraud. Defendants in such cases have notice only that they are being accused of committing some fraudulent act in the past which caused the failure of their business and a loss to the plaintiff.

**\*5** An appropriate remedy for a complaint which fails to comply with Rule 9(b) is dismissal, although the trend in most courts is to permit plaintiff an opportunity to amend, as required by the liberal policy permitting amendments under Rule 15. *See* 5 Wright & Miller § 1300 at 661 (1990). Some courts maintain that the appropriate remedy for a failure to plead fraud with particularity is a Rule 12(e) motion for a more definite statement. Regardless of how the remedy should be styled, it is clear that outright dismissal should generally be reserved for extreme situations where the pleader has had the opportunity to cure any deficiencies but either has not or cannot do so. *See id.*

### B. The Complaint

Plaintiff Shields, the intervenor, and the putative class members were all purchasers of WBC common stock over the period March 5, 1988 to July 18, 1990. The Shields complaint and the Moffett complaint allege that the Washington Bancorporation and its two chairman during the relevant period, defendants John Toups and Luther Hodges, violated §§ 10(b) and 20 of the Securities and Exchange Act of 1934 and various regulations of the Securities and Exchange Commission. Both complaints allege that the defendants made material misstatements of fact and withheld material information concerning the bleak financial prospects of WBC and its principal holding, NBW. The complaints generally allege that the defendants made "unduly optimistic statements concerning WBC's operations" and "creat[ed] a picture of financial strength and prosperity which was unrealistically favorable." Shields Complaint at ¶ 24; Moffet Complaint at ¶ 23.[FN2] Plaintiffs then identify the relevant documents that are alleged to be misleading; according to plaintiff, "WBC's reports on SEC Forms 10-K, 10-Q, Annual Reports

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                         Page 5

Not Reported in F.Supp., 1992 WL 88004 (D.D.C.), Fed. Sec. L. Rep. P 97,310
**(Cite as: Not Reported in F.Supp.)**

and all other publicly disseminated documents" were misleading. Shields Complaint at ¶ 25; Moffett Complaint at ¶ 24. In essence, plaintiff alleges that *all* of the statements made by WBC during the relevant period upon which any investor could have relied were fraudulent. This type of scattershot approach does not particularize the actual statements which are allegedly fraudulent in a manner that puts defendants on notice as to the charges against them and does not satisfy Rule 9(b).

Nonetheless, the unspecific nature of these allegations are not fatal to the complaint, as plaintiff then sets forth a series of examples from the public documents which are allegedly misleading, either because they are untrue or because defendants omitted other material information. Under § 10(b) of the 1934 Act and Rule 10b-5, defendants need only have disclosed "material fact[s] necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b) (1991). Defendants argue that the charges are not sufficiently particular and that, indeed, plaintiffs never actually allege that any of the excerpted statements are false. Plaintiff responds that each example and its accompanying allegation satisfy Rule 9(b). The court must take each allegation of fraudulent conduct separately to assess whether the particularity requirement is satisfied in each case.

*6 In paragraph 26 of the Shields complaint (Moffett Complaint at ¶ 25), plaintiff sets forth language from WBC's 1987 Annual Report filed on an SEC 10-K Form ("1987 10-K"). The language describes the procedures used by WBC management to determine the proper level of allowances for losses on loans as follows:

The annual provision and the level of the allowance for possible losses, are based on management's analysis of the quality of the portfolio, as reviewed by senior credit officers and the loan review staff. These reviews consider historical relationships and current circumstances, anticipated market conditions, and the size of the portfolio....

The allowance and provision for loan losses are based on several factors, including continuing examinations and appraisals of the loan portfolio by the bank's loan review department; examinations by supervisory authorities; continuing reviews of problem loans and overall portfolio quality; analytical reviews of loan loss experience in relation to outstanding loans; and management's judgment with respect to economic conditions and their impact on their existing loan portfolio.

Shields Complaint at ¶ 26; Moffett Complaint at ¶ 25. Plaintiffs claim that this statement is fraudulent because it "falsely portrayed WBC as a sound, growing and responsible lender with rigorous internal policies and procedural mechanisms designed to detect problem loans and avoid credit risks." Shields Complaint at ¶ 29; Moffett Complaint at ¶ 28.[FN3] Yet plaintiffs never allege that WBC did not follow any of the procedures listed above. The basis for the claim for fraud seems to be that, because NBW subsequently failed, these procedures must not have been followed or that somehow the report's explanation of the procedures is deceptive.[FN4] Without describing how the procedures are sufficiently misleading to constitute fraud or whether the procedures were indeed not followed, defendants have no idea what fraud they are alleged to have committed.

If the charge against the defendants is that they failed to reveal material information, plaintiffs must indicate with some specificity what that information was. It is not at all clear what these statements about bank procedures have to do with material omissions about the bank's financial condition; rather, on the face of the current complaints (each of which has already been amended once), the statements appear simply to be a place for plaintiffs to hang their allegations, so that they need not identify specific material omissions. Similarly, it is not sufficient to allege that defendants "failed to disclose material facts regarding the actual financial condition of WBC." Shields Complaint at ¶ 29; Moffett Complaint at ¶ 28. Plaintiffs need to be far more specific as to what was omitted. *See Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 115 (2d Cir.1982).

Nor can plaintiff meet Rule 9(b)'s burden by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 6

Not Reported in F.Supp., 1992 WL 88004 (D.D.C.), Fed. Sec. L. Rep. P 97,310
**(Cite as: Not Reported in F.Supp.)**

bootstrapping on WBC's subsequent financial distress. Paragraph 29 goes on to describe this "actual financial condition" of WBC as one "which would eventually result in WBC's declaration of an $86 million loss for the first six months of 1990." This is unquestionably "fraud by hindsight." *Denny,* 562 F.2d at 470. Plaintiff alleges no facts to demonstrate fraud, but rather relies on the subsequent failure of WBC as evidence of fraud. Plaintiffs are candid that the subsequent financial problems encountered by WBC are the bases of their claims:

*7 [T]he statements cited in the Complaint ... were materially misleading because they failed to disclose the penultimate material fact that WBC was in danger of imminent collapse and, in particular, that: (a) its commercial real estate and other commercial loans were so risky, over-leveraged and speculative that by July 18, 1990 WBC was forced to report that it had increased its loan loss reserves by $61 million and that non-performing assets mote than doubled since December 31, 1989; and (b) WBC's liquidity levels were about to be reduced below acceptable levels for properly conducting its business with the likelihood of insolvency in the near future. Shields Mem.Op.Mot.Dis. at 28.

Yet these alleged frauds are wholly dependent on the future financial collapse of WBC and the complaints do not allege any particular condition about the company *during* the Class Period that the defendants should have disclosed. Plaintiffs cite *Nicholas v. Poughkeepsie Sav. Bank,* slip. op. at 15 (S.D.N.Y1985), and *In re Coleco Sec. Lit.,* 591 F.Supp. 1488, 1490 (S.D.N.Y.1984), for the proposition that the future collapse of NBW is evidence of a prior fraud. These cases, however, involve much more specific complaints by plaintiffs and defendants who made predictions about the future which subsequently did not pan out. While this has some application to this case, the court cannot accept the plaintiffs' apparent reliance on these cases for the proposition that future business failure is equivalent to a sufficiently particularized allegation of a prior fraud. The defendants do not know what misdeeds they are alleged to have committed, other than failing to predict that their

business would run into financial trouble.[FN5] Thus, with respect to the allegations of fraud in Paragraphs 26 and 29 of the Shields Complaint (Moffett Complaint at ¶¶ 25 and 28), plaintiffs have failed to meet their burden under Rule 9(b).

In Paragraph 27 (Moffett Complaint at ¶ 26), plaintiffs quote WBC's policy, as stated in the 1988 10-K, concerning real estate loans. According to the 1988 10-K, WBC sought to "pursue selective middle market real estate projects using a variety of lending products and to maintain a diversified portfolio according to project type, customer, and location. The customer base consisted of some fifty well-established develop[ers] in the local market." Plaintiffs then allege that defendants failed to disclose "the extent to which the 'fifty well-established develop[ers] in the local market' were speculative, over-leveraged and high risk." *Id.* Plaintiffs and defendants squabble in their memoranda over whether "the extent to which" language of this paragraph alleges anything at all. Plaintiffs are correct that the court must find reasonable inferences in favor of the complaint in assessing a motion to dismiss under Rule 9(b). Nevertheless, although plaintiff need not plead evidence to satisfy Rule 9(b), plaintiffs must state the factual basis for their allegations.[FN6] Plaintiffs, at least in Shields' memoranda of law, state that Paragraph 27 of the Shields complaint alleges that the loans made by NBW were excessively risky and that such information was not disclosed. Although plaintiffs probably would not be forced to plead specific loans which were allegedly inappropriately risky, *but see DiLeo,* 901 F.2d at 627, plaintiff still must have some factual basis for this assertion. Plaintiffs' only factual allegation is, once again, contained in Paragraph 29 (Moffett Complaint at ¶ 28), where plaintiff attempts to bootstrap off the subsequent failure of NBW to show fraud in the preceding years.[FN7] Such generalized allegations do not comport with Rule 9(b).

*8 Paragraph 28 of the Shields complaint (Moffett Complaint at ¶ 27) alleges that defendant Toups, in a letter to shareholders included as part of the 1989 10-K, stated that NBW was making "substantial progress" and that more such progress was possible in the year ahead. In addition, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 7

Not Reported in F.Supp., 1992 WL 88004 (D.D.C.), Fed. Sec. L. Rep. P 97,310
**(Cite as: Not Reported in F.Supp.)**

complaint quotes from the 1989 10-K which stated that non-performing loans had increased, but that

> The Company continued to enhance its credit management process during 1989 through the use of a definitive credit risk rating system, specific credit policies for specialized lending areas, and refined early warning systems to identify negative trends in individual clients or industry groupings. Management believes that well-structured and responsive credit policies and procedures along with effective training in the credit management process, should strengthen the asset quality of the Company in the coming years.

Shields Complaint at ¶ 28; Moffett Complaint at ¶ 27. These statements by WBC are somewhat different from those alleged in other paragraphs. The other quotes alleged fraud with respect to statements which do little more than relate the company's internal procedures. Without a properly plead allegation that these procedures were not being followed, it is difficult to see how they can form a basis for a fraud claim. The 1989 10-K, however, sets forth some limited predictions for the future that are more qualitative statements about the financial health of the bank. Plaintiff needs here to simply allege that these statements were untrue when made and to provide a factual basis for this assertion. Plaintiffs, however, have not indicated what was fraudulent in these statements. Are defendants being sued because the loan loss reserves did not increase? Did the defendants not take any of the steps which they say that they took to strengthen asset quality? What knowledge did they have at the time that would make their predictions of the future fraudulent? It is not enough to state, as plaintiffs do in paragraph 28 (Moffett ¶ 27) that these statements fail to disclose "the actual financial condition of WBC which would eventually result in WBC's declaration of an $86 million loss for the first six months of 1990." Plaintiffs once again need to particularize why these statements were fraudulent when made.

Paragraphs 31-33 (Moffett Complaint at ¶¶ 30-32) set forth several passages which describe WBC's liquidity management practices. Plaintiffs do not allege that any of these practices were not

followed, nor do plaintiffs indicate why these disclosures were misleading. None of the statements directly relate to the actual condition of the bank, but rather refer to general principles of banking and liquidity management and specific practices which the bank (apparently undisputedly) followed. Plaintiffs simply cannot allege the practices of the bank and a subsequent loss to make out a claim of fraud, even if the practices described sound like those of a bank on rock solid foundation. What plaintiffs are alleging is nothing more than that WBC stock looked like a good investment, but subsequently lost money, and thus that any statement upon which they relied was fraudulent. Once again the factual basis for the fraud-how defendants' statements were misleading and what facts plaintiffs are relying on to make their assertions-are not revealed.[FN8] That is what Rule 9 requires.

**\*9** The remainder of the complaint discusses the subsequent failure of NBW in 1990 and generally alleges fraud on the part of defendants. In Paragraph 40 (Moffett Complaint at ¶ 39), plaintiffs allege generally that the defendants failed to disclose or made misleading statements concerning WBC's liquidity problems, the adequacy of its internal loan review and credit risk procedures, the riskiness of the real estate loans, and problems WBC was having with loan loss reserves. These allegations of themselves are inadequate, but even in conjunction with the specific statements which plaintiffs identify in earlier paragraphs, plaintiffs fail to satisfy Rule 9(b). [FN9] The general statement in Paragraph 40 (Moffett Complaint at ¶ 39) is but a summary of the prior claims which the court has found do not comport with Rule 9(b). Further, plaintiff never alleges a factual basis for any of the alleged omissions of perceived inadequacy in WBC procedures. Paragraphs 41-48 of the Shields complaint (Moffett Complaint at ¶¶ 40-47) allege the remaining elements of plaintiffs' claims, but add nothing to specify the exact claims against the defendants. Paragraphs 49-51 of the Shields complaint (Moffett Complaint at ¶¶ 48-50) incorporate all of the preceding paragraphs and alleges violations of § 20 of the 1934 Act; these claims similarly fail to meet the requirements of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                     Page 8

Not Reported in F.Supp., 1992 WL 88004 (D.D.C.), Fed. Sec. L. Rep. P 97,310
**(Cite as: Not Reported in F.Supp.)**

Rule 9(b). The last five paragraphs of the complaint seek recovery for common-law negligent misrepresentation. If plaintiffs are unable to cure the deficiencies in their federal securities law claims, this court may not have jurisdiction over the plaintiffs' negligent misrepresentation claims. In addition, the failure to meet the pleading requirements of Rule 9(b) may also be fatal to plaintiffs' claims of negligent misrepresentation. *See Marra v. Burgdorf Realtors, Inc.,* 726 F.Supp. 1000, 1007 (E.D.Pa.1989). None of these paragraphs alter the court's concluion that the plaintiffs have failed to plead in accordance with Rule 9(b).

*III. Conclusion*

Were the court to hold that plaintiffs' claims met Rule 9(b)'s standard, anyone who had lost money on an investment would be able to sue for fraud. The only allegation necessary would be an unexpected financial setback; not many people invest in anything expecting to lose money. With this one allegation plus the appropriate window-dressing by a good attorney, a claim would be born that might potentially have a substantial settlement value. Rule 9(b) must require more than this. Thus the court will dismiss plaintiffs' complaints, unless plaintiffs file amended complaints within 30 days which comport with the strictures of Rule 9(b).[FN10] Additionally, Moffett's motion to intervene shall be GRANTED and defendants' motion to dismiss the complaints shall be GRANTED and a separate order shall issue this date.[FN11]

*ORDER*

Upon consideration of the memoranda of counsel and for the reasons stated in the accompanying memorandum opinion it is hereby ORDERED that:

**\*10** 1. Moffett's motion to intervene as class plaintiff is GRANTED;

2. Defendants' motion to dismiss the Shields complaint shall be GRANTED unless plaintiff Shields files, within 30 days of this date, an

amended complaint that comports with the requirements of Rule 9(b) of the Federal Rules of Civil Procedure;

3. Defendants' motion to dismiss the Moffett complaint shall be GRANTED unless plaintiff Moffett files, within 30 days of this date, an amended complaint that comports with the requirements of Rule 9(b) of the Federal Rules of Civil Procedure;

4. Defendant Toups' motion for summary judgment on the Shields complaint is DENIED without prejudice;

5. Defendant Toups' motion to compel is DENIED without prejudice;

6. Plaintiff Shield's motion to consolidate this case with *Washington BancorRoration v. Said,* C.A. 88-3111, for discovery purposes is DENIED without prejudice.

SO ORDERED.

FN1. Defendants here and other courts have feared perpetual tolling of the statute of limitations if intervenors such as Moffett were permitted to continue a class action. *See Salazar-Calderon,* 765 F.2d at 1351; *Andrews v. Orr,* 614 F.Supp. 689, 692 (S.D.Ohio 1985). While the court does not deny that this is possible, nonetheless there does not appear to be a significant threat of such a problem in this case. Further, the equitable nature of the tolling doctrine insures that courts will be able to fashion appropriate responses to potential abuses of the doctrine by plaintiffs.

FN2. The court notes that, despite the allegedly rosy picture that WBC is alleged to have painted, plaintiffs acknowledge that information available to the public indicated that WBC was not performing well as early as 1987. *See* Shields Complaint at ¶ 20; Moffett Complaint at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 9

Not Reported in F.Supp., 1992 WL 88004 (D.D.C.), Fed. Sec. L. Rep. P 97,310
**(Cite as: Not Reported in F.Supp.)**

¶ 19.

FN3. Paragraph 29 of the Shields complaint (Paragraph 28 of the Moffett complaint) contains general allegations which are equally applicable to the alleged misrepresentations in Paragraphs 26, 27, and 28 of the Shields Complaint (Paragraphs 25, 26, and 27 of the Moffett Complaint). The court's analysis of Paragraph 29 as it relates to Paragraph 26 of the Shields complaint is also equally applicable to Paragraphs 27 and 28.

FN4. Plaintiff cites *In re U.S. Healthcare Inc. Sec. Lit.,* 122 F.R.D. 467, 470 (E.D.Pa.1988), for the proposition that no further detail is required as to how the statements made by defendants were allegedly false. *See* Shields Mem.Opp.Mot.Dis. at 24. Yet, in that case, in the language quoted in Shields' memorandum, it is clear that the plaintiff specifically alleged that reasonable accounting practices were not followed, referred to the appropriate standards, and identified a particular study which was not properly completed. Plaintiffs here have not so particularly identified any act that was not done. Plaintiffs at one point suggest that the "purportedly stringent procedures" would have informed defendants of the impending financial crisis. *See* Shields Mem.Opp.Mot.Dis. at 9. This language makes the nature of plaintiffs' claims even more obscure.

FN5. Plaintiff Shields in his memorandum states that "it is hardly credible for Toups and WBC to have claimed that the company had 'refined early warning systems.' " Shields Mem.Opp.Mot.Dis. at 7-8. Yet "it is hardly credible" cannot suffice to particularize the alleged fraud or to provide a factual basis of the allegation made. It is nothing more than the syllogism "the company failed so they must have been lying."

FN6. Plaintiff argues that he need not plead materiality with much specificity as it is a mixed question of fact and law not appropriate for any sort of resolution at this stage. *See TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 450 (1976). While the court agrees with this proposition, plaintiff has not been sufficiently particular in identifying what exactly is alleged to have been material, other than that WBC was about to collapse. Similarly, under Rule 9(b), plaintiff may allege intent generally, but the complaint does not at all specify what it is that defendants are alleged to have known and intentionally concealed. *See Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990) (stating that plaintiff must provide "the factual basis" to give rise to a "strong inference" of fraudulent intent).

FN7. Similarly in Paragraph 30, plaintiff alleges that the defendants' "public portrayal of WBC as a financially sound entity concealed the fact that WBC was in a bleak financial and operating condition which would or could cause banks which had advanced lines of credit to WBC to cut those lines of credit off and cripple WBC's ability to raise capital." These allegations are nothing other than an allegation that, because the bank failed, there must have been fraud. Rule 9(b) requires more.

FN8. Paragraph 33 (Moffett Complaint at ¶ 32) includes one statement that directly relates to the financial condition of the bank. The 10-Q which WBC filed for the quarter ending September 30, 1989 stated that WBC had "enhanced its liquidity over the past year...." Plaintiffs, however, in no way allege that this statement is untrue nor allege any facts that were true at the time to make this statement misleading.

FN9. The complaint continues to refer to all of the releases and public statements made by WBC throughout the Class Period

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 10

Not Reported in F.Supp., 1992 WL 88004 (D.D.C.), Fed. Sec. L. Rep. P 97,310
**(Cite as: Not Reported in F.Supp.)**

as fraudulent. The court cannot consider these allegations except in the context of the specific examples cited by plaintiff.

FN10. The court is troubled that after four complaints (two by Shields and two by Moffett) plaintiffs will be given another opportunity to amend. Nonetheless, recent decisions in this circuit suggest that the court should liberally allow such amendments. *See Crawford-el v. Britton,* 951 F.2d 1314 (D.C.Cir.1991).

FN11. In light of the court's ruling on the motions to dismiss, a variety of pending motions become irrelevant at this time. Defendant Toups has filed a motion for summary judgment that roughly parallels his motion to dismiss. The court shall DENY this motion at this time without prejudice so that defendant Toups may reinstate the motion, taking into account whatever may arise in the amended complaints which plaintiffs may file. In addition, the court shall DENY, without prejudice, plaintiff Shields' motion to consolidate this case for discovery purposes with *Washington Bancorporation v. Said,* C.A. 88-3111. Further, the court shall DENY, without prejudice, defendant Toups' motion to compel. All of these motions may be irrelevant, depending on the new complaints which must be filed.

D.D.C.,1992.
Shields v. Washington Bancorporation
Not Reported in F.Supp., 1992 WL 88004 (D.D.C.), Fed. Sec. L. Rep. P 97,310

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.