UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ARTHUR BELL, as Trustee of the Albert R. Bell Living Trust, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action No. 07-1578 (ESH) |
| FRANCES ROTWEIN | ) ) ) |
| and | ) ) |
| BANK OF AMERICA, N.A. | ) ) ) |
| Defendants. | ) ) ) |

**MEMORANDUM OPINION AND ORDER**

Arthur Bell, as Trustee of the Albert R. Bell Living Trust, has brought this suit against Frances Rotwein, both individually and in her capacity as co-personal representative of the estate of Joseph Rotwein, and against the Bank of America ("BOA"), as co-personal representative of Joseph Rotwein's estate. Defendant Frances Rotwein has filed a motion to dismiss the complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). For the reasons stated herein, this motion will be granted in part and denied in part.

**FACTUAL BACKGROUND**

In March 1958, Joseph Rotwein, together with his business partners Martin Bell and Lester Abelson, obtained a leasehold interest in the apartment building located at 1500 Massachusetts Avenue NW, Washington D.C. (the "1500 Building"). (Compl. ¶ 9.) Joseph Rotwein lacked the funds to pay for his one-third share of the leasehold, so he offered Albert A.

1

Bell, father of plaintiff and brother of Martin Bell, one-tenth of his one-third share of the leasehold in exchange for $20,000. (*Id.* ¶ 11.) He offered the same deal to Robert Mayer ("Mayer"). (*Id.* ¶ 12.) Both Albert Bell and Mayer accepted. (*Id.* ¶¶ 13-14.) Albert Bell paid Rotwein $20,000 and Joseph Rotwein signed a document assigning to Albert Bell one-thirtieth of the leasehold. (*Id.* ¶ 13.) Martin Bell also made various partial assignments of his share of the 1500 Building. (*Id.* ¶ 15.) Because Martin Bell and Joseph Rotwein preferred to keep record title to the leasehold in the names of the three record owners, Mayer and Albert Bell did not record the assignments from Joseph Rotwein, but left them in the safekeeping of Martin Bell in exchange for Rotwein's commitment that he would account to them for the principal and income of their investments. (*Id.* ¶¶ 19-20.) Although formal record title remained with the record holders, the 1500 Building was operated as a partnership or real estate syndicate (the "Syndicate") and was referred to as such in its financial statements. (*Id.* ¶ 23.)

Until his death in 1991, Joseph Rotwein distributed to Albert Bell ten percent of any distributions made on his one-third share of the 1500 Building. (*Id.* ¶ 51.) In the intervening years, the Syndicate expanded its holdings. In 1968, the Syndicate purchased an option to acquire a vacant lot ("Lot 831") adjacent to the 1500 Building. (*Id.* ¶ 29.) Albert Bell contributed $2,500, or one-thirtieth of the deposit of $75,000. (*Id.*) The option was purchased in the name of the record owners, but Albert Bell and the other assignees received interest on the deposit money in the same manner as the operating revenue and capital distributions relating to the 1500 Building. (*Id.* ¶ 30.) In 1973, the Syndicate refinanced the 1500 Building for $5,000,000, which resulted in the distribution of $2,700,000 to the equity owners. (*Id.* ¶ 33.) Albert Bell received $90,000 for his one-thirtieth interest. (*Id.*) Finally, in 1980, the Syndicate

exercised the option to purchase Lot 831.  (*Id.* ¶ 35.)  Martin Bell sent Albert Bell and the other assignees a letter from the record owners offering them the option to decline to participate in the new acquisition.  (*Id.*)  Albert Bell elected to participate and began to receive income from the lease of Lot 831 consistent with his share of the Syndicate.  (*Id.* ¶ 37.)

On November 5, 1986, Martin Bell died.  (*Id.* ¶ 38.)  On or around February 11, 1987, when his secretary was going through his papers, she found the original assignment documents from Joseph Rotwein to Mayer and Albert Bell.  (*Id.* ¶ 39.)  Because Joseph Rotwein and Martin Bell had shared office space, Bell's secretary asked Rotwein what she should do with the documents and Rotwein instructed her to give them to him.  (*Id.*)  When Albert Bell learned that Joseph Rotwein was in possession of his original assignment, he requested that Rotwein turn over the assignment document to him.  (Id. ¶ 42; Pl.'s Ex. E.)  Rotwein responded to Albert Bell in a letter explaining that "[t]he understanding was that persons holding under [Martin Bell] and me would have only derivative rights rather than direct rights as tenants in common," which was "why there was deliberately no delivery to [Albert Bell] of the original of the document." (Def.'s Ex. A.)   Rotwein further explained that "several of the people who held under Marty [Bell] were furnished originals but only after executing a manager's agreement which accomplished the same result as withholding delivery" (*id.*), and offered to send Albert Bell a similar agreement.  Albert Bell declined, reassured by the offer and by the continued stream of payments.  (Compl. ¶ 47.)  On January 31, 1990, the Syndicate purchased the fee title to the 1500 Building.  (*Id.* ¶ 52.)

On December 28, 1991, Joseph Rotwein died, leaving his widow, Francis Rotwein, as his principal legatee and as co-personal representative of his estate, along with BOA's predecessor.

3

(*Id.* ¶ 54.)  Joseph Rotwein's one-third interest in the Syndicate's property transferred automatically to Frances Rotwein, as personal representative and to the bank as her co-personal representative.  (*See* Def.'s Reply 3; D.C. Code Ann. § 20-105.)  On September 28, 1999, BOA and Frances Rotwein, as co-personal representatives of the estate, deeded to Frances Rotwein personally, the estate's 26.67% interest in the 1500 Building and Lost 831.  (*Id.* ¶ 57.)  The balance of 6.67%, which represented the shares assigned to Albert Bell and Mayer, remained in the possession of Frances Rotwein and BOA as co-personal representatives.  (*Id.* ¶ 60.)  Albert Bell continued to receive the distributions on his 10% interest in the property of the Syndicate in his own name, and later through the Albert Bell Living Trust, which he established in the mid-1990s as part of his estate planning.  (*Id.* ¶ 73.)

At some point in November 2006, plaintiff learned from a family member associated with the Martin Bell share that the record owners were considering selling the 1500 Building.  (*Id.* ¶ 96.)  On February 16, 2007, plaintiff's attorney sent a letter to the management company of the 1500 Building and to the record owners asserting plaintiff's right to a one-thirtieth share of the property.  (*Id.* ¶ 97.)  On February 28, 2007, defendant's attorney responded denying knowledge of the arrangement and stating that the original assignment was not in defendant's possession.  (*Id.* ¶ 98.)  Further correspondence did not resolve this dispute, and on September 5, 2007, plaintiff filed a complaint requesting a declaratory judgment requiring defendant to acknowledge plaintiff's interest in the property (Counts I, II) and alleging that defendant has breached the contract between plaintiff and Joseph Rotwein (Count VI) and breached her fiduciary duty to plaintiff by indicating her intention to deny plaintiff any of the proceeds of the sale of the 1500 Building (Counts III, IV, IX).  Plaintiff further claims that defendant is equitably estopped from

refusing to acknowledge plaintiff's interest in the property (Count V) and that defendant is liable for the common law torts of conversion (Count XI), negligent misrepresentation (Count VIII), spoilation (Count X), and fraud (VII). Finally, plaintiff maintains that defendant has committed fiduciary waste by failing to properly maintain the 1500 Building (Count XII) and requests an accounting of recent distributions. (Count XIII).[1] The defendant has moved to dismiss all counts. The Court will address each of defendant's arguments in turn.

## ANALYSIS

### I. Legal Standard

A complaint must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted if it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 137 S.Ct. 1955, 1974 (2007). At this stage, all reasonable factual inferences must be construed in plaintiff's favor, and all allegations in the complaint are presumed true. *Maljack Prods., Inc., v. Motion Picture Ass'n of Am., Inc.*, 52 F.3d 373, 375 (D.C. Cir. 1995). "However, the court need not accept inferences drawn by the plaintiff[] if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Comm'cns. Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). To survive a motion to dismiss, the factual allegations of the plaintiff "must be enough to raise a right to relief above the speculative level." *Bell Atl.*, 137 S.Ct. at 1965.

### II. Laches

---

[1] Robert Mayer has also filed a complaint in Superior Court alleging similar claims. *See Sleepy Hollow Investment Trust LLC v. Defendant Rotwein*, No. 0006874-07.

Defendant first argues that plaintiff's six equitable claims are barred by laches because she has been prejudiced by plaintiff's 20-year delay in asserting those claims. (Def.'s Mot. 4.) Laches is an equitable doctrine that is "founded on the notion that equity aids the vigilant and not those who slumber on their rights." *Pro-Football, Inc. v. Harjo*, 415 F.3d 44, 47 (D.C. Cir. 2005) (quoting *NAACP v. NAACP Legal Def. & Educ. Fund, Inc.*, 753 F.2d 131, 137 (D.C. Cir. 1985) (internal quotation marks omitted)). "This defense . . . 'requires proof of (1) lack of diligence by the party against whom the offense is asserted, and (2) prejudice to the party asserting the defense.'" *Pro-Football, Inc.*, 415 F.3d at 47 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121-22 (2002)) (internal citation omitted).

Defendant argues that Joseph Rotwein's letter of July 20, 1987, in which he declined to deliver the original assignment document was sufficient to put Albert Bell on notice that he lacked direct ownership of the subject property. (Def.'s Mot. 6-7.) She argues that she was prejudiced by the subsequent 20-year delay because Joseph Rotwein, a key party to the 1956 transaction, has since passed away and therefore cannot testify as to the nature of his agreement with Albert Bell. (*Id.* 7.) Defendant maintains that the loss of this "essential testimony is precisely the kind of prejudice against which the doctrine of laches was intended to protect." (*Id.*)

What defendant fails to acknowledge, however, is that assuming plaintiff's characterization of the oral agreement between Albert Bell and Joseph Rotwein to be true, as the Court must as this stage, plaintiff's claims based on the breach of that contract did not accrue until defendant indicated that she did not intend to recognize his ownership interest in the building. According to plaintiff's complaint, his understanding of the agreement between Bell

and Rotwein was that he would receive 10 percent of the proceeds from the operation or disposition of the leasehold in exchange for his investment.  Until defendant's attorney told plaintiff that defendant would not recognize his interest in the property in 2007, plaintiff had no reason to believe that this understanding would not be honored because he had continuously received distributions consistent with his claimed interest in the properties since making his original investment.  Plaintiff would have had no basis to bring suit against defendant prior to that date, given that the contract (as he understood it) had never been repudiated.

Defendant asserts, however, that the 1987 letter unambiguously informed Bell that he had "derivative rights rather than direct rights as [a] tenant[] in common."  (*Id.* 6 (quoting Def.'s Ex. A)).  The letter does not, however, indicate that Rotwein intended to repudiate the alleged oral agreement.  To the contrary, it stated that Rotwein would either retain the original assignment or send Bell the original assignment document if he would sign an agreement acknowledging his ownership interest, while preserving Rotwein's control over the management of the properties. (Compl. ¶ 45;  Pl.'s Ex. F [Management Agreement between Marjorie L. Gluckman and Martin W. Bell].)  Nothing in the letter indicates Rotwein's "unequivocal[] and positiv[e] . . . intention not to perform" the terms of the agreement as plaintiff understood them.  *Order of AHEPA v. Travel Consultants, Inc.*, 367 A.2d 119, 125 (1976).  *See also Reiman v. Int'l Hospitality Grp., Ltd.*, 614 A.2d 925, 929 (D.C. 1992) ("Anticipatory repudiation is not something to be lightly inferred in the rugged give-and-take of the marketplace.").  Absent such an explicit repudiation, there was no justiciable controversy that plaintiff could have brought an action to resolve.  *See McIntosh v. Washington*, 395 A.2d 744, 754 n.24 (D.C. 1978) (a request for declaratory relief may be considered if "the facts alleged . . . show that there is a substantial controversy, between

parties having adverse legal interest, of sufficient immediacy and reality to warrant the issue of a declaratory judgment") (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239-42 (1937)) . The Court will therefore deny defendant's motion to dismiss plaintiff's six equitable claims as time-barred.

### III.     Defendant's Capacity to be Sued

Defendant next argues that plaintiff's claims against her in her individual capacity and as the personal representative of Joseph Rotwein must be dismissed.  She maintains that the time to bring suit against her as a personal representative has expired and that she owes no duty to plaintiff in her individual capacity.  (Def.'s Mot. 8-13.)  Plaintiff contends that defendant retains control over the contested interest in the Syndicate's property, and therefore she owes plaintiff any duty previously owed by Joseph Rotwein.  (Pl.'s Opp'n 19-22.)

Although not directly challenging plaintiff's assertion that she is currently in control of this interest, defendant argues that she may not sued for her management of it because the statute of limitations has expired for lawsuits against her in her capacity as personal representative. (Def.'s Mot. 8.)  Defendant explains that because the administration of the estate was unsupervised, her term as personal representative expired automatically three years after the date of her appointment on April 1, 1996.  (*Id.* 9-10.)  She maintains that the estate closed automatically three months later.  (*Id.*)  Defendant therefore argues that all claims of personal liability against her in her capacity as a personal representative are barred because they were not filed with one year after the closing of the estate, or before July 1, 1997.  (*Id.* 10.)   Defendant further contends that she may not be sued in her individual capacity because she only transferred the 26.67% interest that undisputedly belonged to Joseph Rotwein into her personal account.

8

(*Id.* 11. 12.)   In sum, defendant appears to be claiming that she has no current legal relationship with the contested interest that would subject her to suit.

This argument is disingenuous.   The parties appear to agree that the disputed 6.67% interest in the properties has never been disbursed.  (*See* Compl. ¶ 60; Def.'s Mot. 14.) Presumably, therefore, it remains in the control of defendant Rotwein and her co-personal representative, despite defendant's contention that the estate is closed.   Although defendant appears to be correct that the estate is "deemed" closed automatically three months after the termination of the appointment of personal representative, it seems clear that the statute anticipates that the personal representative will have distributed all of the assets prior to the closure of the estate.  *See* D.C. Code. Ann. § 20-1303.[2]   Therefore, if the property remains in the estate and defendants Rotwein and BOA have the ability to exercise control over that property as co-personal representatives, then defendant Rotwein is subject to suit in that capacity.[3]

If, however, the interest is no longer part of the estate but remains under defendant's control, then defendant is in a position to compensate plaintiff for the share of the property that he claims in the event of a sale and defendant would owe plaintiff a fiduciary duty as the successor-in-interest to the record title held by Joseph Rotwein.  The Court will therefore deny defendant's motion to dismiss the claims against her in her personal capacity as well as in her

---

[2] It would be strange indeed to read the statute to permit the personal representative to retain control of estate property, while at the same time allowing her to insulate herself from suit by simply permitting her term to expire and the estate to close automatically.

[3] Alternatively, if the property remains in the closed estate, but is not under defendant's control, then the estate will have to be reopened and defendant reappointed in order to carry out the sale of the 1500 Building, at which point defendant would be subject to suit as personal representative.

capacity as the co-personal representative of her husband's estate.

### IV. Breach of Contract

In challenging plaintiff's contract claim, defendant first reiterates her position that plaintiff has no claim against her personally and that plaintiff's cause of action for breach of contract accrued in 1987, upon receipt of Joseph Rotwein's letter, and therefore this claim is outside of the statute of limitations for contract claims. (Def.'s Mot. 13-15.) The Court has already rejected these arguments.

Defendant next contends that to the extent plaintiff's claim relies on an oral agreement with Joseph Rotwein, it is unenforceable under the Statute of Frauds because it was not memorialized in writing.[4] (Def.'s Reply at 10-11; D.C. Code Ann. § 28-3502.) However, defendant fails to acknowledge that "[p]artial or complete performance under an oral contract may remove a case from the applicability of the statute." *Amberger & Wohlfarth, Inc. v. District of Columbia*, 300 A.2d 460, 463 (D.C. 1973). Here, plaintiff alleges that in exchange for his $20,000 investment, Joseph Rotwein agreed to pay him his proportional share of the income on the property and to remit to him his share of the sales price in the event of a sale. The assignment was not recorded on Rotwein's request, but rather given to Martin Bell for safekeeping. In reliance on these representations, plaintiff paid Rotwein the $20,000 and subsequent sums as the Syndicate increased its holdings. In return, Joseph Rotwein made regular payments to plaintiff of his share of the rental income and other profits from the property. At the time of Martin Bell's death, Joseph Rotwein offered to give plaintiff the original

---

[4] Defendant also raises the same arguments against plaintiff's equitable estoppel claim. (Def.'s Mot. 21-23.) The motion to dismiss will also be denied with respect to this count.

assignment document if he would sign a manager's agreement acknowledging plaintiff's interest but leaving the management of the building exclusively to Rotwein and the other record owners. Rotwein said that executing the manager's agreement would "accomplish the same result as withholding delivery," and in reliance on this statement and on Rotwein's continuing payments, Albert Bell did not sign the management agreement. Through the time of his death in 1991, Joseph Rotwein distributed 10% of his share of the profits from the property to plaintiff, and defendant continued to cause these payments to be made after his death. On the facts as alleged, it appears that a jury could conclude that Albert Bell was induced by Joseph Rotwein's promise and by his conduct in consistently making payments to Bell of his pro rata share not to execute the assignment agreement or to sign the management agreement, either of which would have verified his claimed interest in the property. *See Railan v. Katyal*, 766 A.2d 998, 1008 (D.C. 2001). Furthermore, it appears that both parties have partially performed on the alleged oral agreement. *See, e.g., Fitzgerald v. Hunter Concessions, Inc.*, 710 A.2d 863, 865 (D.C. 1998). The Court concludes therefore that at least at this stage of the litigation, dismissal of this claim as barred by the Statute of Frauds is unwarranted.

      **V.    Fraud and Negligent Misrepresentation.**

Defendant argues that plaintiff has failed to allege a claim of fraud or negligent misrepresentation. (Def.'s Mot. 15-21.) To make out a claim for fraud in the District of Columbia, plaintiff must allege "(1) a false representation or willful omission in reference to a material fact, (2) made with knowledge of its falsity, and (2) with intent to induce the party to rely on the representation or omission, where (4) the party relies upon the representation or omission, (5) to its detriment." *Cadet v. Draper & Goldberg, PLLC*, 2007 WL 289 3418, at * 6

(D.D.C. Sept. 28, 2007) (citing *Schiff v. AARP*, 697 A.2d 1193, 1198 (D.C. 1997)).  To show negligent misrepresentation, plaintiff must allege that defendant (1) made a false statement or omission of fact; (2) the statement was in violation of a duty to exercise reasonable care; (3) the false statement or omission involved a material issue; (4) the plaintiff relied to his detriment on the false information; and (5) the defendant's conduct was the proximate cause of plaintiff's injury.  *See Burlington Ins. Co. v. Okie Dokie, Inc.*, 329 F.Supp.2d 45, 48 (D.D.C. 2004).

Plaintiff's fraud and negligent misrepresentations claims arise out of the same set of facts.  He alleges that "after Rotwein's death, some person who was a member of his family or employed by a member of his family, secretly destroyed or secreted the original documents as part of a scheme to deprive Albert Bell and the Mayer family of their rights."  (Compl. ¶ 158.) He further alleges that "at some point [defendant knew] the document no longer existed because she could not find it among her late husband's papers or herself disposed of it; and she knew she intended to keep all the proceeds of disposition.  Yet, she continued to pay Bell his *pro rata* share in order to deceive him into thinking he needed to take no further steps to protect his right to the big payout."  (Pl.'s Opp'n 33-34.)  Plaintiff alleges that this behavior by defendant caused him to "refrain[] from taking the steps he otherwise would have taken to further protect his interest . . . ."  (Pl.'s Opp'n 36-37.)

Both claims fail because plaintiff has not alleged any injury that he has suffered as a result of defendant's alleged omission or misstatement.  Plaintiff argues that defendant's failure to alert him that she would not recognize his ownership interest in the property in the event of a sale prevented him from taking steps to secure his property interest.  However, plaintiff learned of defendant's intentions prior to the sale of the 1500 Building and is taking steps to protect his

interest now.  Plaintiff does not explain how earlier notice of defendant's position would in any way have helped his case, or conversely, how the delay has prejudiced his claim.  Plaintiff has continued to receive his share of the income generated by the property and will have the opportunity to assert his interest prior to the disposition of the proceeds of its sale.  And finally, plaintiff has a photocopy of the assignment document, which could be admissible if the original assignment document is lost or destroyed.  *See* Fed. R. Evid. 1004.  Plaintiff's fraud and negligent misrepresentation claims will therefore be dismissed.

### VIII.  Spoilation and Conversion

Defendant finally alleges that plaintiff has failed to state a claim for either spoilation or conversion. (Def.'s Mot. 23-24.)   Both of these claims are rooted in plaintiff's allegation that defendant took possession of and destroyed the original assignment document.  Both claims fail because plaintiff has a photocopy of the document that may be admissible in litigation.  *See* Fed. R. Evid. 1004.  Spoliation requires a showing that the loss or destruction of the document significantly impairs the plaintiff's ability to prove his claim.  *See Holmes v. Amarex Rent-a-Car*, 180 F.3d 294, 297 (D.C. Cir. 1999).  Because plaintiff has a photocopy, he cannot make this showing.   Nor can he make out a claim for conversion because he retains a copy of the document and therefore has "not [been] deprived of the beneficial use of the information." *Furash & Co., Inc. v. McClave*, 130 F.Supp.2d 48, 58 (D.D.C. 2001) (citing *Pearson v. Dodd*, 410 F.2d 701, 706 (D.C. Cir. 1969)).   Defendant's motion to dismiss will therefore be granted as to the spoilation and conversation claims.

### CONCLUSION

For the reasons stated herein, defendant's motion to dismiss [Dkt 8] is **GRANTED** with

respect to Counts VII, VIII, X, and XI, and **DENIED** with respect to the remaining claims.  An initial scheduling conference is set for March 28, 2008, at 9:15 a.m.

    **SO ORDERED**.

                                        /s/
                                ELLEN SEGAL HUVELLE
                                United States District Judge

Date:   March 5, 2008